1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT

9

## CENTRAL DISTRICT OF CALIFORNIA

10
11
12
13
14
15
16
17
18

| | |
|---|---|
| El Carmen, Inc., a California corporation, and Amerisal Foods, LLC, a California limited liability company,<br><br>        Plaintiffs,<br><br>    vs.<br><br>Eliseo Rubio, et al., individuals, and Chaparrastique Warehouse LLC, a California limited liability company,<br><br>        Defendants. | Case No. CV 21-2070-MWF (AJRx)<br><br>**FINDINGS OF FACT AND CONCLUSIONS OF LAW** |

19
20
21
22

    This matter came on for trial before the Court sitting without a jury on August 23, 2022. The following witnesses were called and examined by the parties in the order recited below:

23
24
25
26
27
28

    On August 23, 2022, David Hoffman, Esq., and Michael Conway, Esq., appeared on behalf of Plaintiffs El Carmen, Inc. ("El Carmen") and Amerisal Foods, LCC ("Amerisal Foods") and gave an opening statement. R. Joseph Trojan, Esq., and Lan Dang, Esq., appeared on behalf of Defendants Eliseo Rubio, Marta Rubio, Eliseo Rubio and Marta Rubio DBA Chaparrastique Warehouse, and Chaparrastique Warehouse, LLC ("Chaparrastique") and gave an opening statement.

On the same day, following opening statements, Mr. Hoffman examined **Vanessa Faggiolly**, principal of Amerisal Foods and El Carmen. Mr. Trojan cross-examined Ms. Faggiolly.

On August 24, 2022, Mr. Trojan continued his cross-examination of Ms. Faggiolly. Mr. Hoffman conducted a redirect examination, and Mr. Trojan conducted a recross examination.

Next, Mr. Hoffman examined **Antonio Rodriguez**, the manager and owner of Galaxy Printing. Mr. Trojan cross-examined Mr. Rodriguez. Mr. Hoffman conducted a redirect examination.

Next, Mr. Hoffman examined **Cristian Merlos**, a sales representative and manager employed by Amerisal Foods. Mr. Trojan cross-examined Mr. Merlos.

Next, Mr. Trojan examined **Magdalena Sanchez**, a cashier at Alondra Mini Market. Mr. Conway cross-examined Ms. Sanchez. Mr. Trojan conducted a redirect examination, and Mr. Conway conducted a recross examination.

Next, Mr. Trojan examined **Lester Velazquez**, the owner of Velazquez Distributor Foods. Mr. Conway cross-examined Mr. Velazquez. Mr. Trojan conducted a redirect examination, Mr. Conway conducted a recross examination, and Mr. Trojan conducted a redirect examination.

On August 25, 2022, Mr. Trojan examined **German Rodas**, owner of El Turco Meat Market. Mr. Conway cross-examined Mr. Rodas. Mr. Trojan conducted a redirect examination.

Next, Mr. Trojan examined **Julie Ngu**, a general manager for Pacific French Bakery. Mr. Conway cross-examined Ms. Ngu.

Next, Mr. Trojan examined **Vanessa Flores**, an office manager at Exposition Fish & Poultry Market. Mr. Conway cross-examined Ms. Flores.

Next, Mr. Trojan examined **Marta Rubio**, an individual defendant and principal for Chaparrastique Warehouse. Mr. Conway cross-examined Mrs. Rubio.

///

Next, Mr. Trojan examined **Luis Diaz Henriquez**, owner of Sabor Latino Food Store.  Mr. Conway cross-examined Mr. Diaz Henriquez.

On August 26, 2022, Mr. Conway continued his cross-examination of Mr. Diaz Henriquez.  Mr. Trojan conducted a redirect examination.

Next, Mr. Trojan examined **Otoniel Rubio**, a principal for Chaparrastique Warehouse LLC.  Mr. Conway cross-examined Mr. Rubio.  Mr. Trojan conducted a redirect examination.

On November 11, 2022, Mr. Hoffman made closing arguments on behalf of Plaintiffs.  Mr. Trojan made a closing argument on behalf of Defendants.

There is no need to rule explicitly on the objections in the deposition transcripts, stated in the Final Pretrial Conference Order, or made at trial.  To the extent an exhibit is discussed herein, any objection was overruled.  To the extent that an exhibit is not discussed, it was not viewed as particularly probative and therefore any objection may be viewed as overruled as moot.  The Court did not sustain any objection to any particular evidence, be it an exhibit or testimony, that would have changed the outcome here.

During and after testimony, exhibits were marked and received into evidence.  (*See* Joint Exhibit List (Docket No. 89)).  Following the presentation of evidence and the parties' closing arguments and subsequent memoranda of law, the matter was taken under submission.

Having carefully reviewed the record and the arguments of counsel, as presented at the trial and in their written submissions, the Court now makes the following Findings of Fact and reaches the following Conclusions of Law under Rule 52 of the Federal Rules of Civil Procedure.  Any finding of fact that constitutes a conclusion of law is also hereby adopted as a conclusion of law, and any conclusion of law that constitutes a finding of fact is also hereby adopted as a finding of fact.

///
///
///

1    **I.    FINDINGS OF FACT**

2        **A.    The Parties**

3            1.    Plaintiff El Carmen, Inc. is a California corporation which owns trademarks

4    "PERLA" and "PERLA BANDERA DE EL SALVADOR" ("El Carmen Marks"),

5    comprising nine federal registrations.  (*See* First Amended Complaint ("FAC") (Docket

6    No. 37) ¶¶ 4, 7–8).  Plaintiff Amerisal Foods, LLC is a California limited liability

7    company that is the exclusive licensee of the El Carmen Marks.  (*Id.* ¶¶ 4, 7).

8            2.    Defendants Eliseo Rubio and Marta Rubio are individuals domiciled in

9    California who do business as Chaparrastique Warehouse.  (*Id.* ¶ 5).   Defendant

10   Chaparrastique Warehouse, LLC is a California limited liability company.  (*Id.*).

11       **B.    Plaintiffs' Use of "Perla"**

12           **1.    Background of Amerisal Foods**

13           3.    Ms. Faggiolly testified that a family friend of hers owned Amerisal Import

14   Export, LCC ("Amerisal") in 2007, and she began working at Amerisal in January 2008 as

15   the owner in training.  Ms. Faggiolly testified that Amerisal was a warehouse that sold

16   Latin American foods in California, including Los Angeles, and other several states.

17   According to Ms. Faggiolly's testimony, this job was her first time being involved with

18   the food business, and she had no knowledge of Defendants before 2008.

19           4.    Ms. Faggiolly testified that GSUS Empire's brand of cheese and cream

20   products, called Perla Bandera de El Salvador, sold well at Amerisal in 2008 when she

21   started her employment.  Ms. Faggiolly stated that she first saw Perla Bandera de El

22   Salvador products in grocery stores in January 2008, when she began working at

23   Amerisal.  Ms. Faggiolly testified that Amerisal continued to sell GSUS Empire's Perla

24   Bandera de El Salvador products from 2008 to 2010.

25           5.    Ms. Faggiolly testified that the Perla Bandera de El Salvador cream and

26   cheese products both had the same marks:  "Perla" in large letters, a swoosh, a cow, and

27   the brand's tag line.  Ms. Faggiolly testified that a current GSUS Empire Perla bag of

28

cheese looks the same as the product she sold in 2008, which had the large-lettered "Perla" name was predominant on the bag.

6.      Ms. Faggiolly testified that Amerisal's customers and consumers of this product referred to it as "Perla cheese" or "La Perla cheese." The Spanish words "la," singular, and "las," plural, translate to the definite article "the" in English.

7.      Ms. Faggiolly testified that she visited approximately 10 to 15 grocery stores daily, Monday through Friday, while working at Amerisal from 2008 to October 2010. Ms. Faggiolly testified that she never observed any other cream or cheese products with "Las Perla" or "Las Perlas" on the packaging until the end of 2010.

8.      Ms. Faggiolly testified that she visited Defendants' Chaparrastique Warehouse multiple times a week between 2008 and 2010 to roll boxes of Amerisal's Petacones cheese product into the warehouse. During these visits, Ms. Faggiolly testified that she saw the whole warehouse, including the area where cheese products were stored. Ms. Faggiolly further testified that she never saw "Las Perlas" or "Las Perla" cream or cheese products at the Chaparrastique Warehouse during that timeframe.

9.      Mr. Cristian Cardoza Merlos has been a salesman at Amerisal Foods since the end of 2013. Mr. Merlos testified that he came across Perla Bandera de El Salvador food items in the marketplace around 2006 and 2007 while working as a salesperson for Novamex, a company that sold non-cheese food products from Mexico to grocery stores. Mr. Merlos recalled that he first saw, and thereafter regularly purchased, the Perla Bandera de El Salvador cheese product in La Corona Market in Reseda in 2006. Mr. Merlos testified that he first saw Perla Bandera de El Salvador food products in La Paz Bakery in Canoga Park in 2007. Mr. Merlos also testified that he first saw Perla Bandera de El Salvador food products in El Super markets in Panorama City, North Hollywood, and Arleta in 2007. According to Mr. Merlos's testimony, in and prior to 2008, Mr. Merlos had never seen any cheese or cream products with the Las Perla or Las Perlas marks in any market, including the approximately 50 stores he visited each week in his route covering the downtown Los Angeles, the San Fernando Valley, and Venture County.

## 2.    Ownership of Perla Bandera de El Salvador Trademark

10.    Ms. Faggiolly testified that ownership of the Perla Bandera de El Salvador trademark began with Ms. Elfy Gomez, who registered the mark on September 1, 2009 according to the United State Patent and Trademark Office ("USPTO").  (Px. 191).  The USPTO certificate provides that the registration number for this mark is 3,675,468 ("the '468 mark").  (Jx. 177).  In the '468 trademark application, Ms. Elfy Gomez, the President of GSUS Empire, is marked as the owner.  (Jxs. 177, 188.003).  USPTO records show that the mark was assigned from Ms. Elfy Gomez to GSUS Empire; then to Amerisal, LCC; then to Ms. Faggiolly and her mother as individuals; and finally to El Carmen.  (*Id.*).

11.    Amerisal negotiated the purchase of GSUS Empire's Perla trademarks for $225,000 in 2010, according to Ms. Faggiolly's testimony.  Ms. Faggiolly testified that Amerisal purchased the '468 mark because she believed it would be a great asset.  Ms. Faggiolly additionally testified that, before the purchase, GSUS Empire's Perla Bandera de El Salvador was sold in grocery stores and supermarket chains, such as El Super, Liborio, El Turco, and El Mercadito.

12.    Ms. Faggiolly testified that she hired counsel, Andrew Schroeder, Esq., to conduct due diligence before purchasing the '468 trademark.  Ms. Faggiolly testified that Ms. Schroeder's due diligence included a search of the federal trademark database, but that she was not aware at the time that due diligence for purchasing a trademark also involved checking common law rights.  Ms. Faggiolly's testimony did not resolve whether or not Mr. Schroeder conducted a common law rights search.  Ms. Faggiolly testified that her attorney, Ms. Tamara Harper, later explained to her that a common law rights search was part of due diligence, but Ms. Harper was not involved in drafting the purchase.  Ms. Faggiolly testified that she had become aware of the common law rights search component of due diligence around the time she was sending cease and desist letters.

13.    Ms. Faggiolly stated that Amerisal's purchase of GSUS Empire's Perla trademark was finalized in October 2010.  Ms. Gomez's signature is affixed to the October 2010 trademark assignment from GSUS Empire to Amerisal.  (Jx. 188.003).

According to their initial payment schedule, Amerisal made payments of $5,000 per month to GSUS Empire for the Perla Bandera de El Salvador trademark beginning in November 2010. (Dx. 320). Ms. Faggiolly testified that Ms. Gomez later approached her about a personal emergency and said that she needed to get paid and close the payments quickly. Ms. Faggiolly testified that, for this reason, the parties renegotiated the price of the trademark in 2013, which resulted in an accelerated payment schedule of $29,000 over three months and a discount to the final price from $225,000 to $140,000. (*Id.*). Ms. Faggiolly acknowledged that, before the renegotiation occurred, she had become aware of Chaparrastique's claim that Ms. Gomez's husband, David Gomez, had previously been an employee of Chaparrastique. However, Ms. Faggiolly maintained that this claim did not impact the reduction in price, and the Court finds no reason to disbelieve Ms. Faggiolly's testimony in this respect.

14. Ms. Faggiolly testified that she received a looseleaf notebook (also referred to as a "binder") of GSUS Empire's business records from Ms. Gomez in October 2010, after she purchased the mark. According to Ms. Faggiolly's testimony, Ms. Gomez showed her the notebook before she bought the mark, but Ms. Gomez did not tell her the origins of the documents in the notebook. Ms. Faggiolly testified that the documents in the notebook were the totality of documents Ms. Gomez showed her with respect to GSUS Empire's use of the Perla mark in 2005 and 2006.

15. Ms. Faggiolly testified that the binder contained a price quote for cheese and cream from Sea Sail Plastic. (Px. 26). The quote is dated July 14, 2005 and states "To: Cremasy [*sic*] y Quesos" and "Attn: David Gomez." (*Id.*). There remains some question about Mr. Gomez's relationships with both GSUS Empire and Chaparrastique. Mr. Gomez's wife is the President of GSUS Empire, and later payments made by Amerisal Foods to GSUS Empire for the purchase of the Perla Bandera de El Salvador trademark were addressed to David Gomez. (Dx. 320.006). Ms. Rubio, the wife of Chaparrastique's previous owner, also testified that Mr. Gomez had worked for Chaparrastique. It is unclear whether or not the documents addressed to Mr. Gomez in the binder establish use

of Perla by either company.  Further, the visible portions of the price quote make no reference to any Perla mark and do not indicate whether Elfy or David Gomez in fact purchased bags with a Perla mark from Sea Sail Plastic.  Nonetheless, Ms. Faggiolly testified that the price quote provided her with information about what GSUS Empire was doing with the mark because she trusted what the Gomezes told her about the document's purpose of showing prior use.

16.    The binder also contained an invoice from Sunny Sky Products to GSUS Company, which is dated September 26, 2006 and is marked as paid on September 30, 2006.  (Px. 026.003).  The invoice includes an item description for "La Perla" alongside "8,000 PCS x 5," and Ms. Faggiolly testified that she assumed this referred to an order for plastic bags.  (*Id.*).  Another invoice from Sunny Sky Products to GSUS Company is dated April 5, 2006 and includes "La Perla" listed as an item description.  (Px. 026.012).  Ms. Faggiolly testified that the description indicated 24,000 pieces of plastic bags for the La Perla product.  (*Id.*).  While the invoice does not have a notation indicating that it was paid, the invoice does show a deposit and Ms. Faggiolly testified that she assumed Ms. Gomez had paid in order to get the product.  (*Id.*).  Interspersed throughout the exhibits in this binder were also images of Perla Bandera de El Salvador cheese packaging.  (Px. 026).  While these images do not show any dates, they do include the words "Perla Bandera de El Salvador" on the same package as "Distributed by GSUS Empire," demonstrating GSUS Empire's use of the Perla mark before its sale to Amerisal.

17.    Ms. Faggiolly also testified that she recalled seeing documents indicating that Ms. Gomez used the Perla bags, obtained in connection with the invoices in the binder, to package and sell cheese to customers.  However, Ms. Faggiolly stated that she did not keep and does not have record of these documents.

18.    An invoice to Amerisal from Great American Packaging, a packing company, dated November 29, 2010 shows that Amerisal received art and plates for "Perla Bandera de El Salvador." (Px. 156).

///

19.     Ms. Faggiolly testified that after purchasing the '468 mark in 2010, Amerisal sold cheese, cream, and their own recipe for beans using the Perla Bandera de El Salvador mark.  Ms. Faggiolly also testified that Amerisal sold a pasteurized cheese product, which the company developed for two years starting in late 2010, under the Perla Bandera de El Salvador.  Ms. Faggiolly testified that Amerisal additionally sells pupusas, corn cakes, tamales, powder drinks, and different flavors of cheese under the Perla Bandera de El Salvador mark.

20.     Ms. Faggiolly testified that she became the owner of Amerisal around 2012 and that the entity Amerisal, LLC—also known as Amerisal Import Export, LLC—closed down in 2012.  Ms. Faggiolly stated that she formed a new entity, Amerisal Foods, LCC, which took over for Amerisal.  On December 31, 2012, the "Perla Bandera de El Salvador" trademark was assigned from Amerisal Import Export, LLC to Ms. Faggiolly and her mother.  (Jx. 189).

21.     Ms. Faggiolly testified that, starting in 2012 or 2013, she filed approximately 15 oppositions and cancellations to the U.S. Patent and Trademark Office as part of her due diligence for the brand.  (Px. 99).  Ms. Faggiolly testified that she was aware that the process when filing these oppositions to the Trademark Trial and Appeal Board was to go through full discovery, motion practice, trial on paper, hearings on the trial, trial testimony, and depositions.  She further testified that she filed a lawsuit in District Court in 2020 that went to a consent judgment.  Ms. Faggiolly testified that none of these proceedings went to trial or cost her hundreds of thousands of dollars; however, she also testified that she did not know what the ultimate cost would be at the time she filed the oppositions and District Court action.

22.     Ms. Faggiolly testified that when she first bought the trademarks from GSUS Empire in 2010, Amerisal used the same packaging as GSUS but with Amerisal's name on the package.  Ms. Faggiolly testified that she changed the packaging from saying the cheese was from Nicaragua to El Salvador around 2014 when Amerisal Foods was able to start importing Perla Bandera de El Salvador from El Salvador with her manufacturer.

23.     In 2014, the Combined Declaration of Use and Incontestability for the '468 mark was filed on behalf of Ms. Faggiolly and her mother by Ms. Faggiolly's attorney, Tamara Harper, Esq.  (Jx. 177).  Ms. Faggiolly testified that, at the time of this Combined Declaration, the '468 mark had been continuously used in commerce for five consecutive years from the date of registration in 2009.

24.     The Application for Renewal of the '468 mark was filed by Tamara Harper on behalf of El Carmen on August 31, 2019 and accepted by the USPTO on April 15, 2020.  (*Id.*).  At the time of the Application for Renewal, the Perla Bandera de El Salvador products were being sold in grocery stores, according to Ms. Faggiolly's testimony.

### 3.     El Carmen's registered trademarks

25.     Ms. Faggiolly testified that she formed El Carmen as a holding company, to which she and her mother assigned their trademarks, including nine Perla trademark registrations and five pending applications.  Ms. Faggiolly also testified that Amerisal Foods is the only company that has a license with El Carmen to use the Perla trademarks.  The following list includes El Carmen's nine Perla trademark registrations that were provided to this Court.

> a. Number 3,675,468 for cheese and sour cream under the mark "Perla Bandera de El Salvador."  (Jx. 177).  The registration certificate lists June 15, 2005 as the dates of "first use" and "in commerce."  (*Id.*). The Combined Declaration of Use and Incontestability states that there was no final decision adverse to the owner's claim of ownership of the mark and that there was no proceeding involving the rights pending at the time the application was filed and not disposed of.  (*Id.*).
>
> b. Number 4,571,379 ("the '379 mark") for cheese and sour cream under the mark "Perla Bandera de El Salvador."  (Jx. 178).  Ms. Faggiolly testified that the '379 mark claimed June 15, 2005 as the date of first use and was in use for five consecutive years after the registration date on July 22, 2014.  Ms. Faggiolly testified that, at the time the

declaration was filed, Amerisal Foods was still using the mark in commerce or in connection with all the goods and services, and there had been no final decision adverse to Amerisal Foods's claim of ownership of the mark for those goods or services or to their right to register the mark.

c. Number 4,754,797 for cheese and sour cream under the mark "Perla Bandera de El Salvador." (Jx. 197). The application includes a Declaration of Use and Incontestability that Ms. Faggiolly testified was true at the time of filing. (*Id.*). Ms. Faggiolly testified that the impression she tried to convey with the '797 mark is for the customer to see the Perla name first. Ms. Faggiolly also testified that the purpose of the '797 mark was to give a cleaner look than the '468 mark.

d. Number 4,764,145 ("the '145 mark") for rice, processed beans, and refried beans under the name "Perla Bandera de El Salvador." (Jx. 181). The application includes a Combined Declaration of Use and Incontestability that Ms. Faggiolly testified was true at the time of filing. (*Id.*).

e. Number 5,315,228 for rice, processed beans, and refried beans under the mark "Perla Bandera de El Salvador." (Jx. 182).

f. Number 5,315,343 for corn cakes, pupusas, tamales, and tortillas under the mark "Perla Bandera de El Salvador." (Jx. 183).

g. Number 5,489,533 for processed beans, refried beans, corn cakes, pupusas, and tamales under the mark "Perla." (Jx. 184).

h. Number 5,589,787 ("the '787 mark") for cheese, sour cream, rice, and tortillas under the name "Perla." (Jx. 180). The registration certificate lists June 15, 2005 as the date of first use. (*Id.*). However, the Trademark Office stated, "[t]he mark was first used in commerce in a

different form other than that sought to be registered at least as early as 06/15/2005." (*Id.*).  Ms. Faggiolly testified that she understood the Office included this statement in the registration because the rights acquired in 2005 were for "Perla Bandera de El Salvador," not "Perla" as registered under the '787 mark.  Ms. Faggiolly testified that Amerisal Foods submitted a picture of a bag of one of its cheese with the "Perla" mark as part of the trademark application for the Perla name. (*Id.*).

     i.   Number 6,231,210 for processed cabbage, relish, and tomato sauce for pupusas under the mark "Perla."  (Jx. 185).

26.    Ms. Faggiolly testified that El Carmen also has five pending trademark applications for Perla or Perla Bandera de El Salvador products, including Amerisal Foods's recipes for coffee and powdered drinks.

### 4.    Correspondence between parties

27.    Ms. Faggiolly testified that Amerisal's attorney, Mr. Schroeder, sent a cease and desist letter to Chaparrastique Warehouse on November 17, 2010.  (Px. 58).  Ms. Faggiolly testified that her attorney sent this letter because she began noticing a few items with the name "Las Perla" in mom and pop stores in late 2010.  Ms. Faggiolly testified that she did not receive a response to this first cease and desist letter.

28.    On January 20, 2011, Amerisal's attorney, Roberta Burnett, Esq., sent another cease and desist letter to Chaparrastique Warehouse that referenced the '468 trademark registration.  (Px. 30).  Ms. Faggiolly testified that her attorney sent this letter because she began seeing shop owners sell cheese in bags, which state "packed by Queseria La Perla San Salvador, El Salvador" on the back.  (Px. 138).

29.    On January 25, 2011, Amerisal received a response to their cease and desist letter from Mr. Milner, representing Chaparrastique Warehouse.  (Px. 31).  This letter asserted Chaparrastique's common law rights to the Perla mark based on actual use: "Chaparrastique has been using this design and graphic for at least six years prior to your

client's August 26, 2008 filing date." (*Id.*). This letter also claimed that "PERLA products mysteriously appeared on the market using [Chaparrastique's] design and graphic" after Mr. David Gomez, who delivered Chaparrastique's products for approximately four years, left the company. (*Id.*). Ms. Faggiolly testified that she became aware in 2011 that Chaparrastique Warehouse claimed that Mr. Gomez had been its employee before his wife, Ms. Elfy Gomez, filed for the Perla trademark registration. Ms. Faggiolly testified that she never employed Mr. Gomez.

30.    On January 27, 2011, Ms. Burnett, on behalf of Amerisal, sent a response to Mr. Milner. (Px. 32). This letter asked Defendants both to provide records showing Mr. Gomez was an employee of Chaparrastique Warehouse and to provide proof that Chaparrastique Warehouse had been using its design and graphic prior to the filing of Amerisal's trademark for the Perla marks. (*Id.*). Ms. Faggiolly testified that Amerisal never received a response to this letter.

31.    According to Ms. Faggiolly's testimony, Ms. Gomez gave Ms. Faggiolly a series of invoices from Chaparrastique Warehouse to GSUS Empire after the January 25, 2011 letter. One such invoice is dated April 23, 2009 and lists the following pre-printed items: "16oz Crema 'Las Perlas Del Oriente'" and "16oz Queso Las Perlas de Oriente." (Jx. 29). Ms. Faggiolly stated that this invoice and another Chaparrastique invoice, which did not include any form of Perla under the item list, showed her that "Chaparrastique didn't have the Las Perla brand."

32.    On May 15, 2013, Ms. Tamara Harper, an attorney representing Amerisal Foods, sent a cease and desist letter to Mr. Eliseo Rubio for Chaparrastique Warehouse's use of "Las Perla." (Px. 42). Ms. Faggiolly testified that Amerisal Foods did not receive a response and that she very occasionally saw Las Perla in the marketplace after the letter.

33.    On March 27, 2015, Amerisal Foods's attorney sent a cease and desist letter to Mr. Eliseo Rubio concerning the '468 mark that attached a picture of the Chaparrastique Warehouse cheese. (Jx. 145). Ms. Faggiolly testified that Amerisal Foods did not receive a response to this letter.

34.    Ms. Faggiolly testified that, at the time of the March 2015 letter, she understood that it would cost hundreds of thousands of dollars to bring a lawsuit for infringement.  Ms. Faggiolly also testified that Amerisal Foods was not doing well financially at that time.

35.    Ms. Faggiolly testified that she observed Chaparrastique Warehouse's declining use of Las Perla and Las Perlas products as a result of the cease and desist letters her attorneys sent between late 2010 and 2015.

36.    Ms. Faggiolly testified that Chaparrastique Warehouse neither sued Plaintiff nor filed trademark proceedings against any of Plaintiff's registrations or applications between Plaintiff's first cease and desist letter in November 2010 and the time Plaintiff filed suit in March 2021.  Ms. Faggiolly also testified that she continued to sell product and do business with Chaparrastique, while knowing that they were using the Perla mark, for years after sending the cease and desist letters.

37.    Ms. Faggiolly also testified that she sent cease and desist letters to stores who sell Chaparrastique's Las Perlas products, but that she has never been able to convince stores not to buy from Chaparrastique.

### 5.    Sale of Amerisal Foods products

38.    Ms. Faggiolly testified that Amerisal launched its website in 2010 and the company has had a website continuously through the present.  Ms. Faggiolly estimated in her testimony that the cost of maintaining the website was $30,000.

39.    Ms. Faggiolly testified that Amerisal Foods's website lists its clients, which includes multiple chain stores that buy the Perla Bandera de El Salvador and Perla trademark products ("the Perla products").  (Px. 100).

40.    Ms. Faggiolly testified that the Amerisal Foods website includes a section for "the Perla products."  Ms. Faggiolly also testified that products can be purchased through the website, including about 75 Perla or Perla Bandera de El Salvador products.  Ms. Faggiolly estimated in her testimony that about 10 percent of Amerisal Foods's overall

sales were online. Ms. Faggiolly testified that online products are sold nationwide direct to consumer.

41.    Ms. Faggiolly also testified that the Perla products are sold in brick-and-mortar stores in seven states, including California.

42.    Ms. Faggiolly testified that the Perla products are currently sold in 59 Vallarta supermarkets, about 35 Northgate markets, and about 49 Superior stores.

43.    Ms. Faggiolly testified that about 80 percent of Amerisal Foods's total sales as of 2022 are from Perla-branded food.

### 6.    Financial Records of Amerisal Foods

44.    Ms. Faggiolly estimated in her testimony that Amerisal Foods pays a slotting fee—an amount paid to stores to put products on their shelves—of about $100 per item per store. Ms. Faggiolly testified that this expense is not reflected in the cost of goods sold in the company's profit and loss statement. Ms. Faggiolly testified that she spent approximately $25,000 in slotting fees for Vallarta during the prior year.

45.    Ms. Faggiolly testified that the Amerisal Foods's profit and loss statements indicate the company's approximate net incomes by year, as follows: $44,000 in 2013; $65,000 in 2014; $185,000 in 2015; $100,000 in 2016; $73,000 in 2017; -$48,000 in 2018; and $142,000 in 2019. (Jx. 105). Ms. Faggiolly testified that Amerisal Foods lost money in 2021, a year when the company had an unusual expense in attorney's fees.

46.    Ms. Faggiolly testified that the limit on Amerisal Foods's insurance policy is $2 million, which matches her understanding of what typical chain food stores require. Amerisal Foods's insurance policy is effective as of October 10, 2020. (Px. 102).

47.    Ms. Faggiolly testified that the approximate total sales of Amerisal's Perla products was less than $30,000 in 2008; about $30,000 in 2009; about $350,000 in 2010; and $1.6 million in 2011. (Pxs. 169, 170). Ms. Faggiolly testified that this growth was the result of a change in strategy and expansion in the line of items. Ms. Faggiolly testified that the total sales for Perla products in 2012 was about $1.3 million from Amerisal plus approximately $176,000 from Amerisal Foods, which was formed during

that year.  (Px. 103; Jx. 171).  Amerisal Foods's business records reflect the following approximate total sales for Perla-branded products by year:

       a.  $1.2 million in 2013;

       b.  $1.4 million in 2014;

       c.  $1.6 million in 2015;

       d.  $1.9 million in 2016;

       e.  $2.3 million in 2017;

       f.  $2.7 million in 2018;

       g.  $3 million in 2019; and

       h.  $4.9 million in 2020.  (Jx. 171).

48.    Ms. Faggiolly testified that the total sales of Amerisal Food's Perla-branded items was $4.8 million in 2021.  The total sales of Amerisal Foods's Perla-branded items between January 2012 and August 2021 was about $13 million.  (Px. 122).

**7.    Confusion between Chaparrastique and Amerisal Foods products**

49.    Ms. Faggiolly testified that Chaparrastique never received permission to use El Carmen's Perla marks.

50.    Ms. Faggiolly testified that, in April 2022, she investigated cheese products that she believed belonged to Chaparrastique by purchasing these products from a street vendor, which she documented by photograph.  These purchases included cheeses with the brands Chaparrastique, Las Perlas, and Las Perlas de Oriente from the store El Turco.  (Px. 108).  A cheese product Ms. Faggiolly testified that she purchased from El Mercadito Market shows a mark for Queseria La Perla on the packaging.  (*Id.*).  Ms. Faggiolly testified that she also purchased additional Queseria La Perla cheese products from Chaparrastique Warehouse at street vendor tables outside El Turco and El Mercadito.  (*Id.*).

51.    Ms. Faggiolly testified that consumers are looking for a piece of home when they buy these products, given that a significant number of purchasers of Amerisal Foods's products come from El Salvador.  One bag of Amerisal Foods's Perla Bandera de

El Salvador cheese products shows a map of El Salvador and states, "Product made in El Salvador." (Px. 137.003–004). Ms. Faggiolly testified that this indicated the cheese came from El Salvador.

52. Ms. Faggiolly testified that the Chaparrastique Warehouse products listed the telephone number and address for a company in El Salvador called Queseria La Perla. The package of one La Perla hard cheese product Ms. Faggiolly purchased, which she testified belongs to Chaparrastique, states, "Packed by Queseria La Perla San Salvador, El Salvador, C.A." (Px. 108.011). Ms. Faggiolly testified that she knew that Chaparrastique Warehouse is not located in San Salvador. Ms. Faggiolly testified that she understood the bag came from Chaparrastique Warehouse because the bag had a double inner seal, which she knew was a specific seal only done by Chaparrastique. Ms. Faggiolly testified that she knows and has seen Chaparrastique bag their cheese product in its warehouse.

53. Ms. Faggiolly further testified that one of the Las Perlas packages from Chaparrastique had a double parallel hot seal on the inner bag, which is a type of seal she had only seen before from the Las Delicias vendor. (Px. 110.003). An example of one of Ms. Faggiolly's Perla Bandera de El Salvador products shows that the inner bag is sealed with only one hot seal. (Px. 110.004). Ms. Faggiolly testified that Las Delicias cheese comes from Nicaragua.

54. Ms. Faggiolly testified that she weighed the Chaparrastique Warehouse cheese products she purchased, and she found that the net weight of the products did not match the stated weight on the package. Images of Chaparrastique's bagged La Perla cheese product appear to show that the packaging states a weight of 1 pound, while a scale shows the actual weight as closer to 14 ounces. (Px. 109).

55. Ms. Faggiolly testified that cream and cheese are the only products of Chaparrastique Warehouse that she has seen that use the words Perla or Perlas.

56. Ms. Faggiolly testified that Amerisal Foods's Perla and Perla Bandera de El Salvador products and Chaparrastique's Las Perlas and Las Perla products compete in the same stores. Ms. Faggiolly testified that both companies do business in mom and pop

stores and bakeries.  Ms. Faggiolly also testified that Amerisal Foods's and Chaparrastique's cheese products both sell for between $7 to $10, and their cream products both sell for between $2.99 to $4.99.  Ms. Marta Rubio, an employee and wife of the previous owner of Chaparrastique, testified that Chaparrastique sells cheese for $5.50 and cream for $3.50.

57.    Ms. Faggiolly testified that consumers purchase cheese and cream products in the supermarket without taking long to grab it or study the package.

58.    Ms. Faggiolly testified that Chaparrastique Warehouse's use of the La Perla mark and indication that their product was packed by Queseria La Perla impact the credibility and reputation of Amerisal Foods.

59.    Ms. Faggiolly testified that Amerisal and El Carmen decided to sue in March 2021 because she started receiving two to three calls a month in 2020 from customers complaining exclusively about the poor quality of the Chaparrastique's Las Perla or Las Perlas product.  Ms. Faggiolly testified that customers incorrectly believed that this product belonged to her company—they asked her on the phone "aren't you La Perla?"  Ms. Faggiolly testified that she directed customers to contact Chaparrastique Warehouse and that customers who tried to contact Chaparrastique told her that nobody picked up the phone.  Ms. Faggiolly stated that the customers were very angry and that some told her that they would call the authorities because they thought she was lying about not being the product's true owner.  Ms. Faggiolly testified that this type of phone call from confused callers continued to occur at the time of her testimony.

60.    Ms. Faggiolly also testified that she decided to bring suit because of Chaparrastique's public health closure.  Ms. Faggiolly testified that she became aware of the closure after an incident in the summer of 2020 in which a client, Mi Viejo San Juan, stopped buying her products due to Chaparrastique's closure.  The client, according to Ms. Faggiolly's testimony, told her that he did not want to take the risk despite her explanation that they were a different company.

///

61.     Mr. Merlos testified that there was an incident in spring of 2021 at Mi Viejo San Juan in which he visited the store after they called him saying that some of the product had expired.  Mr. Merlos recounted in his testimony that he inspected the expired product, which did not have a company name on it, and determined that it was not from Amerisal Foods.  Ms. Merlos testified that he then explained to the store manager that he could not credit her because the product did not come from Perla Bandera de El Salvador.

62.     One to two months later, according to Mr. Merlos's testimony, the manager and owner of the same Mi Viejo San Juan store told Mr. Merlos that an inspector from the health department said that Mr. Merlos could not sell the Las Perla product to the store.  Mr. Merlos also testified that the store manager and owner stated that the store could no longer order, and therefore Amerisal Foods could not sell to them, product with the La Perla name.  The store manager also told Mr. Merlos that the specific company at issue was Chaparrastique, but the manager said that he legally did not want any problems with anyone.  Mr. Merlos testified that Ms. Faggiolly told him that Amerisal Foods did not have any health department issues at that time.  Mr. Merlos testified that Mi Viejo San Juan stopped buying Amerisal Foods's Perla-branded product from him from that time until five or six months later.

63.     Ms. Faggiolly described in her testimony two additional incidents in which stores confused her products with those of Chaparrastique.  First, Ms. Faggiolly testified that a consumer at Super King found mold in a Chaparrastique Las Perlas package.  According to her testimony, the cashier exchanged the product, which she later examined at the store and saw the mold.  She testified that she had to give the store a credit to avoid getting in trouble with her buyer.  Ms. Faggiolly testified that she is trying to figure out how to solve with her buyers the problem of confused consumers.

64.     Second, Ms. Faggiolly also testified that a similar incident occurred at one of Jons Market's stores.  She recounted in her testimony that a consumer told the store that the product, Las Perlas cheese from Chaparrastique, was molded and did not taste good.  Ms. Faggiolly testified that she saw the mold on the product when she visited the store.

According to Ms. Faggiolly's testimony, she told the store manager that the store did not get credit for the product from her driver because it did not belong to her company, to which the manager responded that "it's Perla cheese[—][i]t's your responsibility." Ms. Faggiolly testified that she then spoke with the buyer, Jackie, in the store's corporate office. Ms. Faggiolly stated that she apologized to Jackie for the confusion and explained that she would, and did, give credit even though the product was not hers. Jackie told Ms. Faggiolly, according to her testimony, that she would take the issue to her boss if it happened again and reminded Ms. Faggiolly that she needed to get the store credit for everything. Jackie further stated that Ms. Faggiolly had to solve this because she did not want to see this incident again.

65.    Mr. Merlos also testified about an incident in summer of 2022 in which a consumer at Super King Market in Van Nuys returned one cheese product in a "Chaparrastique Las Perla" package that had mold on it. According to Mr. Merlos's testimony, an employee in charge of the store's deli department directed Mr. Merlos to the back of the store to see the product, which was placed alongside Amerisal Foods's products. Mr. Merlos testified that, upon inspecting the product, he found that the package's first bag was opened, the second bag was sealed, and the product was covered in mold. Mr. Merlos also testified that he told the employee that the molded product did not belong to Amerisal Foods and that he could not give a credit for it. The employee, according to Mr. Merlos's testimony, told Mr. Merlos that the product had the same name, and Mr. Merlos replied that the back of the product showed a different company name. Mr. Merlos testified that the employee ultimately told him to leave the product in the store.

66.    Mr. Merlos also testified that on very rare occasions Amerisal Foods has to pick up its own moldy cheese from a store.

67.    Ms. Faggiolly testified that Pacific French Bakery and a couple distributors stopped buying her products due to trademark issues concerning Perla or Las Perlas or La

Perla.  Ms. Faggiolly also testified that she would rather not have her product in mom and pop stores because of confusion with the Chaparrastique products.

### 8.    Product safety policies and systems of Amerisal Foods

68.    Ms. Faggiolly testified that Amerisal Foods's product safety includes an intense recall program, FSVP certifications, automated rotating racks to ensure FIFO rotation of inventory, temperature controls in the warehouse, and a traceability program for recall purposes.  Ms. Faggiolly testified that Amerisal Foods puts its name and contact information on its products for transparency, traceability, and customer experience.

69.    Ms. Faggiolly described the Amerisal Foods warehouse in her testimony as a box in/box out warehouse, meaning that goods are finalized, packaged, seal, and ready to be distributed.  Ms. Faggiolly testified that the health and safety requirements of such a warehouse means that her company is not allowed to open the package, manipulate the product, or touch the product.

70.    Ms. Faggiolly testified that her supplies that process food are USDA certified.  Ms. Faggiolly testified that she has visited USDA plants, which she describes as different than her box in/box out facility because there is a USDA agent that visits twice a day, there are washable walls and floors, and special clothes all to follow an intense protocol.

71.    Ms. Faggiolly testified that Amerisal Foods has a 100% product warranty for her contracts with chain stores, like Walmart, in which her business performs direct store delivery services.  Ms. Faggiolly stated that "[Amerisal Foods] need[s] to show insurances, . . . health department permits, . . . insurance, tax certificates, [and] workers' comp" in order to sell products on the Walmart online store.

72.    Ms. Faggiolly also testified that Amerisal Foods went through a "lengthy process with the FDA" in order to receive a certification from the Foreign Supplier Verification Program.

///

///

**C.    Defendant's Use of "Perla"**

**1.    Background of Chaparrastique Warehouse**

73.    Marta Rubio testified that she started a cheese-delivery business called Chaparrastique Warehouse ("Chaparrastique") with her husband, Eliseo Rubio, in the 1990s.  Ms. Rubio testified that her role at Chaparrastique was to call customers and help her husband, and her husband's role at Chaparrastique was to make payments and do "almost everything."  Ms. Rubio testified that Chaparrastique began selling cheese with Las Perlas on it in 2000 or 2001, but she stated that she could "hardly remember" if the date was earlier than 2000 and that she had no particular reason for recalling 2000.

74.    Ms. Rubio recalled during her testimony that she would help her husband in 2000 by, for example, signing documents, and she recalled taking orders from stores between 2000 and 2010.  Ms. Rubio did not recall answers she provided in her deposition about starting work full-time by 2000.  Ms. Rubio testified that she does not speak English and would pass along any calls to Chaparrastique that were not from Spanish-speakers to her husband.  With regard to taking customer orders between 2002 and 2006, Ms. Rubio testified that she sometimes took orders, but she could not recall statements she made in her deposition about the percentage of orders she took.

75.    Ms. Rubio testified that she remembered speaking with Galaxy Printing and that she regularly looked at invoice pads.  Ms. Rubio also recalled that Chaparrastique's invoice pads were only in Spanish and some were pre-printed with the words "Las Perlas."  However, Ms. Rubio testified that her husband was responsible for designing the content of the invoice pads and that she could not recall many details about the pads, including those in use between 2000 and 2010.  During her testimony, Ms. Rubio contradicted statements she made in her deposition about whether or not she tried to use the invoices in the order of the pre-printed invoice numbers, and Ms. Rubio could not recall answers she provided in her deposition about the frequency Chaparrastique ordered invoice pads from Galaxy Printing.  Ms. Rubio testified that she thinks she looked at a proof of the content of an invoice pad from Galaxy Printing one time.  According to Ms.

Rubio's statements made in her deposition, Chaparrastique thereafter re-ordered that same pad from Galaxy Printing.

76.    Ms. Rubio testified that her husband, Mr. Eliseo Rubio, contracted COVID in 2020, three to four years after he had become diabetic.  Ms. Rubio testified that her husband had to be hospitalized due to COVID in May 2020 and, while hospitalized, had a stroke and went into a coma that lasted about two months.  Ms. Rubio testified that her husband left the hospital in December 2020 and has since been unable to return to work.  Ms. Rubio further testified that her husband's memory has been affected "quite a bit," and he can hardly walk or see, has trouble communicating, and says things that do not correspond to reality.

77.    Ms. Rubio testified that she did not know or could not remember whether Chaparrastique received a cease and desist letter from Amerisal, whether her husband ever dealt with a legal issue relating to the Perlas trademark in 2011, or whether her husband ever dealt with lawyers relating to Chaparrastique Warehouse's business.

78.    In her testimony, Ms. Rubio recalled that cheese and cream were the first products that Chaparrastique sold, and continue to be the only products the company sells, using the Perla or Perlas mark.  Ms. Rubio stated that Chaparrastique's Perla- or Perlas-branded cheese costs $5.50 and cream costs $3.50.

79.    Ms. Rubio testified that she was not familiar with a product, brand, or company called Queseria La Perla and had never seen Chaparrastique sell a product with Queseria La Perla on the packaging.  Ms. Rubio testified that she has ordered packaging labels for Chaparrastique, and that she believes her son Mr. Otoniel Rubio now handles packaging orders, which were previously ordered by her husband.  Ms. Rubio later testified that she did not know whether Chaparrastique ever packaged cheese in a Queseria La Perla bag.  Chaparrastique does in fact include the words "Queseria La Perla" or "Queseria Las Perlas" on multiple of its cheese packages.  (Dx. 383, Jx. 193).  In her deposition, Ms. Rubio also stated that Chaparrastique had bought cheese or cream from Queseria La Perla.  Ms. Rubio's signature next to the words "Design Approved By" is on

a 2014 invoice from Co-Pack, Inc. for a Chaparrastique cheese bag that says "Queseria La Perla." (Jx. 193). Despite this, Ms. Rubio also testified that her husband was in charge of orders from Co-Pack, Inc.

80.    Ms. Rubio testified that she had no knowledge about changes to Chaparrastique's packaging to include the company's name.

81.    Ms. Rubio testified that it was her understanding that "Las Perlas" is the brand or mark under which Chaparrastique sells its products. Ms. Rubio also testified that Chaparrastique did not change its brand name from Las Perlas to La Perla between January 7, 2014 and November 14, 2014 and had no recollection of Chaparrastique using both Perlas and Perla in its branded products. Ms. Rubio testified that her husband was in charge of the spellings of Chaparrastique's products.

82.    Ms. Rubio testified that her children are Mr. Melvin Eliseo Rubio and Mr. Otoniel Rubio.

83.    Ms. Rubio testified that Mr. David Gomez used to work at Chaparrastique doing deliveries and that Mr. Gomez was not an owner.

84.    Ms. Rubio's testimony was replete with unresponsive answers and statements indicating that she could not recall past details and did not know answers about her husband's business dealings. Further, Ms. Rubio could not remember many answers to questions to which she provided specific answers in her deposition. Ms. Rubio's answers during her testimony sometimes indicated that she had trouble communicating with counsel—for example, she provided answers unrelated to the question asked. The Court finds Ms. Rubio's testimony did not discredit her, but rather demonstrates gaps in memory that resulted from the considerable amount of time passed between the present action and many of the events in question.

## 2.    Chaparrastique's use of "Perla" before 2005

85.    Chaparrastique produced invoices dating between 2002 and 2022 in connection with the present action. (Jx. 29; Pxs. 59, 61, 106, 186, 202; Dxs. 350, 360, 361, 362, 363, 364, 365, 370, 377).

86.    The testimony of Ms. Marta Rubio and her son, Mr. Otoniel Rubio ("Mr. Rubio"), provided background to contextualize Chaparrastique's business practices with regard to its invoices.  Ms. Rubio testified that Chaparrastique's NCR invoice pads included both a white and a yellow page per invoice, such that writing on the top white sheet would transfer to the bottom yellow sheet.  According to Ms. Rubio's testimony, after a client paid, Chaparrastique's practice was to give the white sheet to the client and retain the yellow sheet.  Chaparrastique would give the yellow sheets to their accountant for tax purposes, and upon return from the accountant, Chaparrastique would store a year's worth of invoices in a box in the rafters of their warehouse.  After about five years, Chaparrastique would pull down the boxes and throw away invoices that were more than five years old, while retaining all tax records.  Ms. Rubio testified that she and Mr. Rubio, in order to produce documents for the present action, searched in the rafters of the Chaparrastique warehouse for invoices with the words Perla or Perlas, and they found invoices that date back to as early as 2002.  Ms. Rubio also testified that her husband, Mr. Eliseo Rubio, was in charge of "almost everything" at Chaparrastique from the company's founding in the 1990s until 2020, when he suffered health issues that effected his communication and cognitive abilities.  Mr. Eliseo Rubio was unable to testify due to the severity of those health issues.

87.    Many inconsistencies and discrepancies have been presented with regard to the credibility of Chaparrastique's invoices.  The Court summarizes these issues here.

88.    The Court finds that the following set of issues cause skepticism but do not alone undermine the credibility of the invoices from the time period in question.

a.    There is a discrepancy between Ms. Rubio's testimony regarding Chaparrastique's document destruction practice after five years and the existence of many invoices dating before 2005.  (*See* Px. 186).  The testimony of Ms. Rubio and Mr. Rubio illustrates that Chaparrastique is a family-owned business with informal practices and procedures that may account for this discrepancy.

b. Invoices dated to 2004 inconsistently use various forms of the name "Perla." For example, a June 22, 2014 invoice includes both "La Perla" handwritten and "Las Perlas" pre-printed. (Px. 186.022). An invoice from January 5, 2014 has the word "Perla" handwritten, while another invoice from the same date has "Las Perlas" handwritten. (Pxs. 186.011–012). An invoice from January 12, 2004 includes "Quesos Perla" handwritten, while an invoice from March 26, 2004 includes "Quesos Las Perlas" handwritten. (Pxs. 186.013, 017). No witness, included Ms. Rubio, was able to explain Chaparrastique's use of various forms of "Perla."

c. Several 2004 invoices clearly show two different styles of handwriting on the same invoice, where one cursive style is predominant and a second block-letter style is used to write in the "Las Perlas" item. (Pxs. 186.017, 019). No explanation was offered by Defendants.

d. The dates of many invoices do not correspond to any logical ordering of invoice numbers. For example, invoice number 18647 is dated May 4, 2004, and invoice number 14410 is dated May 5, 2004. (Pxs. 186.022–023). Invoice number 13499 is dated March 20, 2004, and invoice number 19981 is dated March 26, 2004. (Pxs. 186.016–017). During cross-examination, Ms. Rubio was not able to explain why invoices dated later in time, but only a few days after an earlier invoice, included an invoice number that is either several thousand numbers lower or higher. During redirect examination, Ms. Rubio agreed with her counsel, who asked if different people in the office had different pads for writing invoices.

e. Invoices dated within the same week or on consecutive days list very different item names that Chaparrastique appeared to be selling. An invoice dated April 1, 2004 lists 20 item names, and an invoice dated

April 2, 2004 lists 21 item names.  (Pxs. 186.018–019).  The Court understands that some products with different names may be the same (for instance, "16 oz Crema Salvadoreña" and "1 lb. SALVADORIAN CREAM"); however, there is not a single pre-printed item name shown on both invoices.   (*Id.*).  In fact, these invoices show that the company appeared to be selling completely different items just one day apart.  For example, red beans, banana tropical, horchata, and chorizo are listed on the April 1 invoice, but no items anything similar to beans, those drinks, or meat are listed on the April 2 invoice.  (*Id.*).  Ms. Rubio offered no explanation for these differences.

f.  Chaparrastique's invoices show differences in ink thickness and shade.  For example, an invoice dated November 29, 2004 shows "La Perlas" handwritten in visibly thicker ink than other ink on the invoice.  (Px. 186.046).  An invoice dated November 13, 2004 on a yellow sheet shows two distinguishable ink colors—one in black and another that is lighter and appears slightly pink.  (Px. 186.040).  The handwriting style appears to be the same in both shades, and some individuals words show both the lighter and darker shades.  (*Id.*).  Other invoices from 2004 appear to contain three shades of ink—light pink, dark pink, and black.  (Pxs. 186.020–021).  When asked about these different during cross-examination, Ms. Rubio testified that she did not know why these invoices appeared this way and stated, "I think it's because it's old."  The Court finds it plausible that someone wrote with black ink on Chaparrastique's yellow sheet copy to improve legibility after handwriting was imperfectly transferred from the client's top sheet copy.  Given the evidence presented, the Court cannot determine if and when the different ink was added to these invoices.

///

89.     On the other hand, the Court finds that the following two issues create a strong presumption against the credibility of several 2002–2005 invoices, which more broadly casts doubt on those invoices that the Court viewed with less skepticism.  These issues are based on the testimony of Maynor Antonio Rodriguez Aguilar, the owner of Galaxy Printing.  During her deposition, Ms. Rubio stated that Chaparrastique ordered invoice pads from Galaxy Printing.  Ms. Rubio also testified that she did not recall ordering invoice pads from any other printing company from around 2000 to 2010.

90.     First, identical printed invoices within the same set of 50 invoice numbers are dated to both 2004 and 2018.  During her deposition, Ms. Rubio recalled that the invoice numbers on Chaparrastique's invoice pads go in sequence.  All of Chaparrastique's invoices include handwritten dates.  Invoice number 22556, which is pre-printed, is dated April 25, 2018 and includes "Galaxy Printing 323-735-4050" on the bottom left corner. (Px 202.044).  Mr. Rodriguez, the owner of Galaxy Printing, testified that he sells NCR invoice pads in books of 100 sheets, which creates 50 invoice numbers.  Mr. Rodriguez testified, "[i]f it's a book, it starts at number 6,000, and it goes to 6,050."  Five invoices from May, June, August, and November 2004 appear identical to the 2018 invoice number *22556*—all six invoices contain a pre-printed invoice number and the word "Las Perlas" pre-printed in the list of items.  (Pxs. 186.024, 029, 030, 031, 033; Px. 202.044).  The 2004 invoice numbers are *22596*, *22597*, *22598*, *22599*, and *22560*.  (*Id.*).  The Court finds that these 2004 invoices are part of the same pad of pre-printed invoices numbered 22550–22600 that Chaparrastique used in 2018, and due to the number order, these 2014 invoices must have been written after April 25, 2018.  Therefore, these 2004 invoices do not demonstrate usage of "Las Perlas" in 2004.

91.     Second, several of Chaparrastique's pre-2006 invoices include the name and 323-735-4050 telephone number for Galaxy Printing.  Mr. Rodriguez testified that he started working with the name Galaxy Printing in 1999 or 2000 and, at the time, worked out of a friend's print shop.  While the Court accepts that Mr. Rodriguez may have informally started a print business at that time, the Court does not find that Mr. Rodriguez

credibly established that he did business under the name "Galaxy Printing" before 2006. Galaxy Printing's fictitious business name statement—filed to the Los Angeles County Registrar-Recorder/County Clerk by Mr. Rodriguez on December 14, 2006—includes marks indicating that December 14, 2006 was the date of first filing and Galaxy Printing had not started doing business at that time. (Px. 093.002). Tax records further corroborate the late 2006 timeframe as the start of Mr. Rodriguez's business. One City of Los Angeles Tax Registration Certificate for "Mynor A Rodriguez" was "started" on December 31, 2006 and issued on January 6, 2007. (Px. 094.005). Another City of Los Angeles Tax Registration Certificate for "Mynor A Rodriguez" and "Galaxy Printing" was "started" on January 1, 2007 and issued on January 6, 2007. (Px. 094.003).

92.    Mr. Rodriguez testified that in 2006 Galaxy Printing took over a business called Zacharias Printing, which was located at Galaxy Printing's current business address. In his testimony, Mr. Rodriguez recalled that he obtained his current land line telephone number, 323-735-4050, for Galaxy Printing in 2006, and he testified that this land line number now goes to his current (and Zacharias Printing's former) business address. Mr. Rodriguez testified that Mr. Zacharias had the 323-735-4050 number when Mr. Rodriguez bought the business. When Mr. Rodriguez was later asked if he could have had the number earlier than 2006, Mr. Rodriguez stated, "[i]t's possible." Mr. Rodriguez did not recall if he used his current number on a different phone before establishing his land line in 2006. When asked how his customers reached him before 2006, Mr. Rodriguez stated, "I remember beepers."

93.    The Court finds that Mr. Rodriguez did not present any credible testimony that Galaxy Printing used the 323-735-4050 land line number before he purchased Zacharias Printing in 2006. In fact, the Courts finds that it is more likely than not that Zacharias Printing used that land line number before 2006. Chaparrastique, however, produced several invoices dated before 2006 that have "Galaxy Printing (323) 735-4050" printed in the bottom left corner. (*See, e.g.,* Pxs. 186.007, 009, 010, 014, 015, 016, 018, 020, 023, 027, 028, 039). These invoices all contain a variation of the word Perla pre-

printed in the item list.  (*Id.*).  The Court does not find that these invoices credibly established Chaparrastique's use of Perla before 2006.

94.    Defendants presented two types of invoices—which the Court categorizes by the invoices' appearance and item list—dated before 2006 that contain "Las Perlas" pre-printed.  (*See, e.g.,* Pxs. 186.024–025).  These invoices either show "Galaxy Printing (323) 735-4050" on the bottom left corner or the scans are cut off just above where "Galaxy Printing" appears on otherwise identical invoices.  (*See, e.g.,* Pxs. 186.022–023).  For the foregoing reasons, the Court views these sets of pre-printed Perla invoices with significant skepticism.  This skepticism extends to all other pre-2006 invoices, in which a variation of the word "Perla" only appears handwritten on the invoices, not pre-printed.  (*See, e.g.,* Px. 186.037).  Therefore, the Court does not find that any invoices presented by Defendants sufficiently establish use of the Perla mark before 2006.

95.    Plaintiff has created a rebuttable presumption by having registered the trademark for Perla first.  The Defendants have the burden to rebut this presumption.  Based on the invoices, the Court determines that Defendants have not presented strong enough evidence to rebut this presumption.  There are serious flaws in the invoices that led the Court to view them with skepticism.  The Court is less skeptical of some of Defendants' invoices where Perla appears only in handwriting; however, the Court finds that these invoices are not sufficiently strong evidence given other invoices that are not credible and the lack of any witness that could strongly corroborate their veracity.

96.    Defendants called a series of witnesses to the stand to testify as to their knowledge of Defendants' use of Perla prior to 2005.  The testimony of these witnesses presented many similarities.  Each witness was approached by a Chaparrastique employee with a form declaration that provided blank spaces to write in the year they first worked with Chaparrastique.  During their testimony, the witnesses demonstrated varying levels of credibility with respect to their recollections from before 2005.  During cross examination, the Court found that several witnesses did not fully understand the declaration they signed and directly contradicted or shed doubt on the statements made in

their declaration.  The Court acknowledges that memory gaps are inevitable due to the significant period of time that has passed since the dates in question.  Nonetheless, none of these witnesses provided credible testimony to corroborate Chaparrastique's pre-2005 invoices or otherwise establish their awareness of Chaparrastique's Perla or Perlas products before 2005.

### 3.   Chaparrastique's operations during health shutdowns

97.    Chaparrastique's more recent business practices regarding public health are also called into question here.  In 2019, the Los Angeles County Department of Public Health ("the Department of Public Health") issued Chaparrastique an inspection report that observed five violations requiring corrective action.  (Pxs. 051.012–013).  Since 2020, the Department of Public Health has shut down the Chaparrastique facility twice.  On September 22, 2020, the Department of Public Health ordered Chaparrastique to immediately "discontinue and cease all operation of [its] business including food preparation and food distribution."  (Pxs. 051.010–011).  On September 29, 2020, the Department of Public Health reinstated Chaparrastique's public health permit and allowed it to resume operations at its facility.  (Px. 051.009).  This report listed October 15, 2020 as the date for re-inspection.  (*Id.*). On October 22, 2020, the Department of Public Health issued Chaparrastique an inspection report observing two violations that required corrective action, but the report made no mention of directions to cease or resume operations.  (Px. 051.020).  On April 15, 2021, the Department of Health ordered Chaparrastique to "discontinue and cease all operation of [its] business including food preparation and food distribution."  (Pxs. 051.021–022).  On August 23, 2021, the Department of Public Health issued a "Plan Check Official Inspection Report" that did not approve Chaparrastique and required further corrections.  (Pxs. 050.001–003).  The reports dated as follows all state that the report was discussed with Otoniel Rubio: September 22, 2020; September 29, 2020; October 22, 2020; and April 15, 2021.  (Pxs. 051, 050).

///

98.     Several of Chaparrastique's invoices, all of which are marked paid, to its customers show dates that coincide with these shut down periods.  In 2020, an invoice to Pacific French Bakery is dated September 23 and marked paid on September 29.  (Px. 106.014).  In 2021, invoices to Sonia's Bakery, Pacific French Bakery, and El Turco Market are each dated May 26.  (Px. 059.001, 059.003–005).  Invoices to Le Marquet and Placita are both dated June 2, 2021.  (Px. 059.007–008).  An invoice to Pacific French Bakery is dated August 19, 2022.  (Px. 059.009).  A check from Super Mercado Latino Market to Chaparrastique is also dated April 28, 2021.  (Px. 059.010).

99.     In her testimony, Ms. Rubio acknowledged these invoices that Chaparrastique prepared during the period it was shut down, but she testified that she did not know if she was taking orders or where the company was operating during that time.  Ms. Rubio stated, "[m]y son was in charge of that."

100.    Otoniel Rubio, who testified that he became the Chief Executive Officer of Chaparrastique in 2020, provided testimony with respect to these shut downs and Chaparrastique's operations during those time periods.

101.    During direct examination, Mr. Rubio stated, "when [my father] first got COVID in the beginning, that is when [the Department of Public Health] came and shut us down."  Mr. Rubio testified that he and his brother took over the company when his father got sick, and "around that time," ownership of Chaparrastique transferred to him and his brother.  During cross examination, Mr. Rubio approximated that his father contracted COVID and was admitted to the hospital "early in the year, around May, April, May" of 2020.  Ms. Marta Rubio testified that her husband, Mr. Rubio's father, was hospitalized because of COVID in May 2020.

102.    According to the Department of Public Health's reports, however, the first shut down occurred for one week in September 2020, not May 2020, and the inspections corresponding to the first and final dates of the shutdown were discussed with Mr. Rubio.  (Px. 051.009–011).  During cross examination, Mr. Rubio replied, "[d]on't remember"

and "I'm not sure," when asked whether he had a general recollection of the Department of Public Health shutting down Chaparrastique for about a week in September 2020.

103.    Mr. Rubio testified that he was running the company by 2021, and while learning how to run the company that year without the help of his father, the Department of Public Health again shut down Chaparrastique.  The Department of Public Health's 2021 order to cease operations began on April 15 and continued at least through August 23, 2021.  (Pxs. 051.021–022, 050.001–003).  Mr. Rubio recalled in his testimony that Chaparrastique was not allowed to open business at least as of August 23, 2021.

104.    Mr. Rubio acknowledged a number of Chaparrastique's invoices that reflect customer purchases of Chaparrastique products during the periods it was shut down. However, Mr. Rubio testified that Chaparrastique "wasn't working" during those periods and did not receive any money for the shipments of products referenced on the invoices from those periods.  Mr. Rubio testified that two individuals were fulfilling orders for products on Chaparrastique invoices during that time.  Mr. Rubio testified that these individuals "could be" or "would be" Martin or Selna.  Mr. Rubio further testified that these individuals were using Chaparrastique's invoices to sell and deliver products that Chaparrastique normally sells to these customers.  Mr. Rubio testified that these individuals, despite fulfilling the orders, did not use their own invoices because "we just provided [the invoices] for them."  Mr. Rubio also testified that these individuals have their own distribution companies, but he could not remember the names of these companies.  During his testimony, Mr. Rubio contradicted a statement made in his deposition that Chaparrastique hired and used Pacific French Bakery as a sales agent during this period to supply product to Chaparrastique's customers.  The general manager of Pacific French Bakery, Ms. Ngu, provided no information about such an arrangement while testifying about her business dealings with Chaparrastique in the past two years.

105.    The Court did not find Mr. Rubio's explanation of Chaparrastique's invoices dated during the shutdown credible.  None of Defendants' California-based customer witnesses testified that Chaparrastique informed them about the company's shutdown by

the Department of Public Health.  None of these witnesses testified that a person named Martin or Selna delivered the Chaparrastique products; rather, most did not recall any change in Chaparrastique's delivery person in the past two years.  In fact, most of these witnesses could not recall a period of time in 2021 in which their business with Chaparrastique was halted at all, and most of these witnesses testified that they only learned about Chaparrastique's shutdown for the first time while on the stand.

106.    Chaparrastique's continued operations during the two shutdown periods are, on the other hand, supported by testimony from the Defendants' witnesses, many of whom provided consistent accounts of Chaparrastique's sales and delivery during the periods Chaparrastique was ordered to cease all operations.  Therefore, the Court relies on the account of witnesses and corresponding invoices to establish that Chaparrastique did in fact continue operating its business in violation of an order from the Department of Public Health.

### 4.    Additional testimony related to Defendant's pre-2006 use of the "Perla" mark and operation during health shutdown

107.    The Court heard testimony from seven witnesses who had business relationships with Chaparrastique.  The Court summarizes the testimony of each of these witnesses below.  While the Court finds that these witnesses credibly testified to Chaparrastique's longstanding business relationships, the Court does not find that their testimony established Chaparrastique's use of the Perla mark before 2005.  All of the witnesses presented credibility issues, and many could not provide credible accounts for events as recent as one year to those over twenty prior to their testimony.  Only one witness, Ms. Ngu, credibly recalled a specific year that she first saw Chaparrastique's Las Perla products; however, this single witness is not sufficient to overcome the Defendants' otherwise unconvincing and not credible evidence.

#### a.  Ms. Magdalena Sanchez

108.    During direct examination, Magdalena Sanchez, a cashier at Alondra Mini Market ("Alondra"), testified that she saw the Las Perlas brand from Chaparrastique

Warehouse when she first started working at Alondra in 2000.  Ms. Sanchez testified that Chaparrastique sold and continues to sell the Las Perlas brand to Alondra.  When asked how long Chaparrastique had been selling Las Perlas cheese to Alondra, Ms. Sanchez stated, "2005 or 2003."

109.    During cross examination, Ms. Sanchez contradicted statements made during direct examination and in her declaration, but later in her testimony stated that her declaration was accurate.  During direct examination, she stated that she first saw the Chaparrastique Las Perlas brand in 2000.  But Ms. Sanchez's declaration states that she was "a customer of Chaparrastique Warehouse since at least the year 2001" and that she "bought [Las Perlas] cheese and cream products from Chaparrastique Warehouse . . . in the year of 2001."  In her testimony, Ms. Sanchez stated that she first started personally ordering Chaparrastique's product for Alondra "around 2004/5."  Ms. Sanchez also testified that her first recollection of seeing the Las Perlas brand was in "2003 or 2005, something like that."  And Ms. Sanchez affirmed in her testimony a prior statement that she purchased Las Perlas brand products from Chaparrastique before January 1st, 2005.  When asked to clarify the first time she recalled purchasing or seeing Las Perlas products, Ms. Sanchez stated, "I wasn't really paying much attention at the time.  Then when I started becoming a cashier, I started paying more attention to what was being ordered."  While Ms. Sanchez did not state clearly when she began her position a cashier, she testified that she learned how to be a cashier after about two or three years of working at Alondra.

110.    An invoice, with "Las Perlas" shown as a pre-printed item, that dates to June 2, 2004 from Chaparrastique to Alondra includes the name "Esmeralda Rios" handwritten next to the "Received by" line.  (Dx. 362.011).  When asked the year Esmeralda Rios started working at Alondra, Ms. Sanchez stated, "I'm not sure if it was 2015, 2010.  I don't remember."  The Court views the credibility of this invoice with skepticism.  Ms. Sanchez also testified that every invoice she has seen from Chaparrastique from the last 22 years includes the exact same items.

111.   The Court finds that Ms. Sanchez's testimony presented inconsistencies and contradictions with respect to her employment at Alondra and memory of first seeing the Las Perlas brand.  The Court, therefore, finds that Ms. Sanchez's testimony does not credibly establish Chaparrastique's use of Perla in the 2000-2005 period.

### b. Ms. Lester Velazquez

112.    Mr. Lester Velazquez, owner of a company that distributes food products, testified that he started buying, in his individual capacity, the Las Perlas brand cheeses and creams from Chaparrastique around October or November of 2004 to distribute to stores.  Mr. Velazquez testified that his company, Velazquez Distributor Foods, began buying these products at wholesale quantities for distribution in 2008, and the company sells them in the Northern California Bay Area to markets, restaurants, and others.

113.   The Court finds that Mr. Velazquez's signed statements and testimony show inconsistencies concerning the first date he purchased Las Perlas products from Chaparrastique.  At different points in his testimony, Mr. Velazquez stated that 2004 or 2008 was the year he first recalled purchasing Las Perla or Las Perlas cream and cheese products from Chaparrastique.  Mr. Velazquez explained that Chaparrastique only became a client of his in 2008, while maintaining that he had purchased their products starting in 2004, because he conducted business as an individual in 2004 before eventually registering his business as a company in 2008.  Mr. Velazquez testified that, while working "on a personal basis" in 2004, he "started buying products from [Ms. Marta Rubio], cheeses, cream, but not this that we see here."  Mr. Velazquez did not explain what he meant by "not this that we see here."

114.   Mr. Velazquez testified that "Las Perlas" has always been the mark on the cheese he purchased from Chaparrastique.  At other points in his testimony he called the mark "Las Perla."  The only invoice presented to the Court from Chaparrastique to Mr. Velazquez before 2006 is dated June 15, 2004 and shows "Las Perlas" pre-printed in the item list.  (Dx. 361.012).  As Mr. Velazquez testified, his name on the document is handwritten in black ink while the date is handwritten in blue ink, and the invoice shows

"Galaxy Printing (323) 735-4050" printed on the bottom corner. (*Id.*). When asked if he understood why there would be different color inks, Mr. Velazqeuz stated, "Well, it's—it's a copy. I don't know. I don't think it's an original document."

115. Mr. Velazquez also testified that, since 2004, no customers have ever made returns of the Las Perlas products to his company.

116. Mr. Velazquez testified that there was never a time when his company stopped buying the Las Perlas products from Chaparrastique, and he testified that he had consistently picked up product from Chaparrastique's warehouse three or four times per month from January 1, 2020 to present. When pressed on whether he recalled a time the business was closed, Mr. Velazquez then testified that Chaparrastique was closed "[f]or a time," and he stated "I don't know if it was now—'20, now—2020 or now, that there was no movement."

117. With regard to whether he understood everything in his signed declaration, Mr. Velazquez stated that, "based on what [Mrs. Marta Rubio] explained to me, that is what I understood." Mr. Velazquez stated that he signed the declaration "to prove that [he had] been buying products during this time from [Chaparrastique]." Mr. Velazquez testified that he did not understand the word "perjury," with regard to his signed declaration, but did "understand the rest of the document."

118. While the Court finds Mr. Velazquez's recollection of a long relationship with Chaparrastique to be credible, Mr. Velazquez's testimony presented many inconsistencies and reasons for skepticism. The Court finds that Mr. Velazquez's testimony does not sufficiently corroborate the credibility of the June 2004 invoice and does not independently establish that he purchased Las Perlas products specifically from Chaparrastique beginning in 2004.

### c. Mr. German Rodas

119. Mr. German Rodas, owner of El Turco Meat Market ("El Turco") since 1999, testified that his company began doing business with Chaparrastique in 2001. According to Mr. Rodas's testimony, 2001 was the first year he started buying Chaparrastique's

cheese and cream products, which he recalled was branded as "Las Perla or something like that," and he stated that he has been buying that brand from Chaparrastique once a week since 2001.  Mr. Rodas testified that he has "not really" had any problems with the brand, and that Chaparrastique is very well-known.

120.   Mr. Rodas also testified that he has been purchasing cream and cheese products from Amerisal for over 10 years.

121.   In his testimony, Mr. Rodas expressed confusion about the name of the Amerisal and Chaparrastique products and stated, "If I'm not too confused, I believe that one of them has a name that is somewhat different from the other one.  It also has different letters."  At various points, Mr. Rodas testified that the brand Amerisal sold was "Las Perlas," "L-a P-e-r-l-a-s," or "La Perla."  Mr. Rodas testified that the brand Chaparrastique sold was "[o]nly Perlas.  Yeah, the same, P-e-r-l-a.  Las Perlas" and also "La Perla."  Upon redirect examination, Mr. Rodas stated that he could "not really" tell the difference between the Amerisal and Chaparrastique packages and that he is "not really" able to know by looking at the packages from which company the products came.  Mr. Rodas testified that "the drawing, the design are different . . . but I'm not too sure."

122.   Mr. Rodas testified that Amerisal and Chaparrastique had been working together for a long time, but he did not testify any further about this statement.

123.   While Mr. Rodas testified that he was not aware that Chaparrastique had been shut down in the two years prior to his testimony, Mr. Rodas otherwise did not present any credible testimony about his business transactions with Chaparrastique in this time period.

124.   The Court also did not find credible Mr. Rodas's statement that he purchased Las Perlas-branded products from Chaparrastique on a weekly basis since 2001.  On cross and redirect examination, Mr. Rodas indicated mixed levels of confidence regarding his recollection of buying Las Perla-branded cheese from Chaparrastique as early as 2001.  While the Court found that Mr. Rodas credibly recalled his long-standing relationship

with Chaparrastique, Mr. Rodas's testimony did not establish with sufficient strength that he had purchased Chaparrastique's Las Perlas cheese product before 2005.

### d. Ms. Julie Ngu

125.    Ms. Julie Ngu testified that she is the general manager of Pacific French Bakery ("Pacific French"), a family owned business in mid-city Los Angeles founded in 1985.  Ms. Ngu stated in her testimony that she has been working at Pacific French full-time for approximately 15 or 17 years and part-time for her entire life.

126.    Ms. Ngu filled out and signed a form declaration written in Spanish in connection with this action.  (Dx. 519).  In the declaration, Ms. Ngu wrote "2003" in a line which states in Spanish the year she first bought Las Perlas products from Chaparrastique.  Ms. Ngu testified that she can "more or less" read and write in Spanish and that she used Google Translate to translate parts of the declaration when she first filled it out.  During her testimony, Ms. Ngu was not able to translate all the language in her declaration.

127.    Ms. Ngu testified that Pacific French has purchased the La Perla brand cheese and cream products from Chaparrastique Warehouse since 2003.  Ms. Ngu recalled in her testimony that the year Pacific French began doing business with Chaparrastique was 2003 because she remembered Mr. Eliseo Rubio came to store to sell cheese and cream a few months after they finished a year-long remodel that started in 2001.  Ms. Ngu also recalled that Pacific French had not previously purchased any cheese and cream before Mr. Eliseo Rubio visited their store.  Ms. Ngu testified that Pacific French has purchased Perla cheese every year since 2003 and has never had problems with the product.  Ms. Ngu also estimated in her testimony that Pacific French purchases Perla cheese generally every week.

128.    Ms. Ngu testified that Pacific French also purchased cheese and cream products from Amerisal beginning in "probably around [2010] or after."  Ms. Ngu testified that Pacific French stopped doing business with Amerisal "maybe a few years" after about 2016 or 2017.  In her testimony, Ms. Ngu explained that Pacific French

purchased Amerisal's Petacones-brand cheese and creams until Amerisal had problems with Petacones, in about 2018 or 2019, that prevented them from bringing in those products. Ms. Ngu suggested in her testimony that Amerisal "was struggling to get Petacones into the United States." Ms. Ngu testified that, after Amerisal could no longer distribute the Petacones brand, Pacific French drastically reduced the items it purchased from Amerisal. Ms. Ngu testified that Amerisal then "tried to rebrand themselves with a new name," which she recalled was Perla, but her customers "weren't familiar with [the new brand] at all" and the brand "didn't really sell with us" because "they didn't really like it." Ms. Ngu stated that Pacific French stopped doing business with Amerisal as a result of this brand change.

129.    Ms. Ngu testified that she did not recall receiving cease and desist letters from Amerisal's counsel in 2015 and explained that the letters "might have been thrown away" or "could have been lost." (Dx. 341).

130.    Ms. Ngu testified that Pacific French consistently made weekly purchases of Perla-branded cheese and cream from Chaparrastique in the two years prior to her testimony in August 2022. Ms. Ngu also testified that a driver named Cristian typically delivered the Chaparrastique product to Pacific French. Ms. Ngu stated that she did not remember Chaparrastique not being unable to deliver products in the last couple of years and that "there was never a month period where we couldn't receive [Chaparrastique's] cheese." According to her testimony, Ms. Ngu was not aware and not informed by any employee of Chaparrastique that Chaparrastique had been shut down and ordered to cease all operation of business by the Los Angeles County Department of Health twice in the two years prior to her testimony. Ms. Ngu further testified that she was neither aware that Chaparrastique was shut down between approximately September 22, 2020 and September 29, 2020 nor for approximately four-and-a-half months in 2021. Ms. Ngu testified that she would not have continued to do business with Chaparrastique had she known they were shut down at the time.

///

131.    Chaparrastique's invoice number 34238 to Pacific French Bakery, for colachampan chica and cubetas de crema, is dated September 23, 2020.  (Px. 106.014). Ms. Ngu testified that the products ordered were not sold under the La Perla brand.  In reviewing the invoice, Ms. Ngu testified that these products were ordered on September 23, entered into the system September 24, and paid on September 29, all in 2020.

132.    Ms. Ngu testified that she believed Pacific French ordered products from Chaparrastique between April 6, 2021 and August 31, 2021.  Chaparrastique's invoice number 069 to Pacific French Bakery, for products including Cremas Las Perla, is dated May 26, 2021.  (Px. 059.003).  Chaparrastique's invoice number 070 to Pacific French Bakery is dated May 26, 2021.  (*Id.*).  Chaparrastique's invoice number 31659 to Pacific French Bakery is dated August 19, 2021.  (Px. 059.009).  Ms. Ngu noted irregularities with the "paid" marking of these invoice; however, the Court does not find that those irregularities undermine the credibility of these invoices.

133.    In her testimony, Ms. Ngu could not recall whether the exact name of the Chaparrastique product was Las Perla or Las Perlas, but stated that "it's just a popular logo" that has "been around for a long time."  Ms. Ngu also testified that her customers would ask for the Chaparrastique cheese if she "accidentally grabbed" the Amerisal cheese.

134.    Ms. Ngu testified that Pacific French placed the Chaparrastique and Amerisal cheese products side by side, and their customers would say they wanted "the real La Perla" in reference to the Chaparrastique brand.  Ms. Ngu further testified that her customers meant by saying "real" that they wanted the authentic "brand where it started" and not a copy.

### e.  Ms. Vanessa Flores

135.    Vanessa Flores has been employed an office manager at Exposition Fish & Poultry Market ("Exposition") since 2010.  Ms. Flores testified that Exposition is a meat market that sells live poultry, cheese, creams, and other products to retail customers at their one facility, located in Los Angeles.  Ms. Flores testified that Exposition purchases

sour creams and cheeses—branded as either Chaparrastique, Chaparrastique Warehouse, or Chaparrastique Warehouse Las Perlas—from Chaparrastique, and either Ms. Flores or her boss issues payments to Chaparrastique.  Ms. Flores testified that the earliest date anyone at Exposition remembers buying Las Perlas cheeses and creams from Chaparrastique was 2001, based on a conversation she had with the owner who remembered dealing with Las Perlas or La Perla in 2001 when he bought Exposition.  Ms. Flores testified that she only has personal knowledge that Exposition has been buying from Chaparrastique since 2010.

136.   While Ms. Flores indicated in her signed declaration that she had personal knowledge that Exposition was a customer of Chaparrastique since 2001, she explained during her testimony that she wrote that date based on conversations with other employees who have been employed at Exposition since 2001.  (Dx. 520).  Given this explanation, the Court does not find that Ms. Flores's misunderstanding of the term "personal knowledge," as stated in her declaration, discredits her testimony.  (*Id.*).

137.   When asked during cross examination about the exact brand of cheeses and creams Chaparrastique sells, Ms. Flores stated that the products "do[] say La Perla or Las Perlas.  I can't remember right now.  But I think it's Las Perlas."  When asked for her best recollection, Ms. Flores reasoned, "Las Perlas – only because whenever it's l-a-s in Spanish, you know, it's 'las.' Mujeres, Las Perlas, las – but, yeah – I could be wrong, from what I remember, it's Las Perlas."  Throughout her testimony, Ms. Flores used both La Perla and Las Perlas.

138.   Ms. Flores testified that Exposition buys the Chaparrastique Las Perlas cheeses approximately once a month, but Ms. Flores testified that the amount they purchase and when they do so depends on "what is finishing" and customer demand.  Ms. Flores testified that customers ask specifically for the "La Perla" brand, for instance "La Perla sour cream or the queso con loroco."  Ms. Flores testified that she does not recall how often she purchased products from Chaparrastique during 2020, but she recalled

generally purchasing monthly in the past year.  Ms. Flores testified that she recalled purchasing Las Perlas products from Chaparrastique from April to August of 2021.

139.   According to her testimony, Ms. Flores was not aware and not informed by any employee of Chaparrastique that Chaparrastique had been shut down and ordered to cease all operation of business by the Los Angeles County Department of Health twice in the two years prior to her testimony.  Ms. Flores further testified that she was not aware of any period of time in 2021 in which Exposition was not able to order products from Chaparrastique.

140.   Ms. Flores testified that either a younger man or an older man, named "Don Rubio," from Chaparrastique delivers products to Exposition.

141.   Ms. Flores testified that she has never had any problems with the cheeses and creams she buys from Chaparrastique.

142.   Ms. Flores testified that Exposition does not sell any products from Amerisal and that she was not familiar with Amerisal.

### f.  Mr. Luis Alberto Diaz Henriquez

143.   Luis Alberto Diaz Henriquez has been the owner of Sabor Latino Food Store in Phoenix, Arizona since 2000.  Mr. Diaz Henriquez testified that he became aware of Chaparrastique in 2000 because he was searching for Central American products and his friends gave him their address.  Mr. Diaz Henriquez testified that he started buying Chaparrastique's "Las Perla, Las Perlas" brand of cheese and cream in 2000.  Mr. Henriquez testified that he continues to buy Las Perlas cream and cheese, and only those products, from Chaparrastique, but that he did not buy their products while they were closed.  Mr. Diaz Henriquez testified that he goes to Los Angeles to personally pick up the products every one to two months, depending on sales.  Mr. Diaz Henriquez testified that he has never had problems with Chaparrastique's Las Perlas cheese and cream.

144.   Mr. Diaz Henriquez testified that he has not heard of Amerisal nor purchases their products.

///

145.    Mr. Diaz Henriquez testified that the packaging of the cream and cheese products he purchases from Chaparrastique have only ever had the name "Las Perlas." Mr. Diaz Henriquez testified that he has never bought a Chaparrastique product with the names "La Perla" or "Las Perla" and has no recollection of both "Chaparrastique" and "Las Perlas" appearing on the packaging.

146.    According to Mr. Diaz Henriquez's testimony, he continued to purchase Las Perlas products once a month or once every other month since 2020.  Mr. Henriquez did recall that Chaparrastique had been closed, but he did not recall the time period it was shut down—he only stated that "it could have been in April [of 2021]."  Mr. Diaz Henriquez testified that Chaparrastique did not tell him about the shutdown, but rather he saw it was closed when he visited the warehouse.  Mr. Diaz Henriquez testified that he was not aware that Chaparrastique was shut down twice by the Los Angeles County Department of Health.

### g.  Mr. Jose Alberto Monroy

147.    Jose Alberto Monroy is the owner of Sonia's Bakery in Los Angeles and has owned the bakery since 1988.  Mr. Monroy testified that Sonia's Bakery sells products such as pastries, cheese, cream, and canned foods.

148.    Mr. Monroy testified that Sonia's Bakery has purchased cheeses, creams, cookies, and other products from Chaparrastique beginning "around the year 2000 or before that."  With regard to the first date he began buying the Las Perla products from Chaparrastique, Mr. Monroy stated, "I don't remember exactly if it was the year 2000. I'm not quite sure."  However, Mr. Monroy testified that he has old documents with invoices from Chaparrastique and imagined the Las Perla brand were the products he was buying in 2000.  Mr. Monroy also testified that he could say with certainty that he sold the Las Perlas cheese from Chaparrastique before 2005.

149.    Mr. Monroy testified that the cheese and cream products are "always under the name 'La Perla,' because that is the brand name that most people recognize . . . [and] other products [are] under the brand name Chaparrastique."  In his testimony, Mr. Monroy

shortly thereafter stated that the cheese and cream products from Chaparrastique have always been "under the brand name Las Perla." Mr. Monroy also testified that he buys a product branded Queseria La Perla from Chaparrastique.

150.  Mr. Monroy testified that Chaparrastique's products were initially delivered to Sonia's Bakery by a person named Oscar and then a different driver, whose name Mr. Monroy could not recall, usually delivered the Perla products. Mr. Monroy testified that he thinks Otoniel Rubio is the current owner of Chaparrastique, but he is "not too sure."

151.  Mr. Monroy testified that he orders cheese from Chaparrastique consistently—typically once a week and sometimes every two weeks. Mr. Monroy testified that his orders from Chaparrastique in 2021 "were quite consistent." Mr. Monroy also testified that he does not "really remember that well" a time when Chaparrastique could not deliver cheese and was not "exactly" aware that Chaparrastique was shut down twice by the Los Angeles County Department of Public Health. However, Mr. Monroy did acknowledge that "maybe at one time or another there was a problem . . . [a]nd they weren't able to provide me with the cheese," and Mr. Monroy recalled someone telling him that "[Chaparrastique] had problems quite often." Nevertheless, Mr. Monroy testified that he was not aware either that Chaparrastique had been shut down between April 16, 2021 and August 31, 2021 nor that Chaparrastique was ordered to discontinue and cease all operation of business during the period it was shut down. Mr. Monroy affirmed that an invoice from Chaparrastique to Sonia's Bakery dated May 26, 2021 listed the products that his company orders. (Px. 59.001). Mr. Monroy testified that he would have probably ordered the same or a similar product from another company if he had known about the shut down when making the May 26, 2021 order.

152.  Mr. Monroy testified that he has never had an experience where one of the Las Perlas products from Chaparrastique was not a good product.

153.  Mr. Monroy testified that his only knowledge of Amerisal was that the company had been "mentioned to [him] maybe once" by his brother, who Mr. Monroy believes either bought or buys Amerisal's Perla Bandera de El Salvador product.

154.    Mr. Monroy stated in his testimony, "my memory is not good." When asked during cross examination to focus on the year 2021, Mr. Monroy first began answering about the year 2001 and then, upon further clarification, asked whether 2021 was two years before his testimony, which took place in August 2022. Explaining this confusion, Mr. Monroy stated, "I am 68 years of age, and . . . I think that my head does not control all of that very well at this point." The Court finds credible Mr. Monroy's recollection of the general timeline of his interactions with Chaparrastique.

155.    To summarize, the Court **FINDS** in favor of Plaintiff in that each of the elements of its claims were proven, but (sitting in equity) further **FINDS** that recovery is barred by the doctrine of laches. Specifically, the Court **FINDS** that the Defendant has proven the elements of laches and that the public health exception should not apply. The Court **FINDS** for Plaintiff in regard to the counterclaims. The specific evidentiary findings supporting these ultimate findings are explicit and implicit in the recitation of the facts above. In addition, there are additional explicit findings below, such as to the *Sleekcraft* factors, that are included in the Conclusions of Law because their significance is dependent on the Court's recitation of the pertinent law (by analogy to jury instructions).

## II.    CONCLUSIONS OF LAW

### A.    Trademark Infringement Claims

1.    A trademark is "any word, name, symbol, or device . . . [used or intended to be used] to identify and distinguish [goods] from those manufactured or sold by others and to indicate the source of the goods[.]" 15 U.S.C. § 1127.

2.    On a plaintiff's claim for trademark infringement, the plaintiff has the burden of proving each of the following elements by a preponderance of the evidence: (1) a valid, protectable trademark; (2) the plaintiff owns the trademark; and (3) the defendant used the mark without the consent of the plaintiff in a manner that is likely to cause confusion among ordinary consumers as to the source, sponsorship, affiliation, or approval of the goods. Ninth Circuit Model Jury Instructions 15.6 (2017 ed., last updated Mar. 2024); *Tie*

*Tech, Inc. v. Kinedyne Corp.*, 296 F.3d 778, 783 (9th Cir. 2002) ("Overall, the plaintiff retains the ultimate burden of persuasion in a trademark infringement action, namely proof of infringement.  A necessary concomitant to proving infringement is, of course, having a valid trademark; there can be no infringement of an invalid mark.").

3.    The test for false designation of origin or unfair competition, is "exactly the same as for trademark infringement: 'whether the public is likely to be deceived or confused by the similarity of the marks.'"  *Century 21 Real Est. Corp. v. Sandlin*, 846 F.2d 1175, 1178 (9th Cir. 1988) (citation omitted); *New W. Corp. v. NYM Co. of California*, 595 F.2d 1194, 1201 (9th Cir. 1979) ("Whether we call the violation infringement, unfair competition or false designation of origin, the test is identical[;] is there a 'likelihood of confusion?'").

### 1.    Valid, Protectable Trademark

4.    Without a registered federal trademark, a plaintiff "may not avail itself of the statutory presumption that it owns and has the right to use [its] mark in commerce in connection with the specified category of goods."  *Glow Indus., Inc. v. Lopez,* 252 F. Supp. 2d 962, 976 (C.D. Cal. 2002) (internal citation omitted).  Without this presumption of ownership, Plaintiff "must establish that it has protectable rights in [its] mark."  *Id.*  This can be done by showing that its mark is either "inherently distinctive" or "has acquired secondary meaning associated with [Plaintiff's] business."  *Id.* at 977 (internal citations omitted).

### a.  Distinctiveness or Secondary Meaning

5.    "To be valid and protectable, a mark must be 'distinctive.'"  *Zobmondo Entm't, LLC v. Falls Media, LLC*, 602 F.3d 1108, 1113 (9th Cir. 2010).  "Distinctiveness measures the primary significance of the mark to the purchasing public."  *Id.*  (internal quotation marks and citation omitted).  The more distinctive a mark, the more protection it will be afforded.  "Marks are generally classified in one of five categories of increasing distinctiveness: (1) generic, (2) descriptive, (3) suggestive, (4) arbitrary, or (5) fanciful."  *Id.* (citation omitted).

6.      "Suggestive, arbitrary, and fanciful marks are considered 'inherently distinctive' and are automatically entitled to federal trademark protection because 'their intrinsic nature serves to identify a particular source of a product.'" *Zobmondo Entm't, LLC*, 602 F.3d at 1113 (quoting *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992)).

7.      On the other hand, a descriptive mark defines qualities or characteristics of a product in a straightforward way, and "will be protected only when secondary meaning is shown." *Id.*  "In between lies suggestive marks which subtly connote something about the products." *Id.*  Suggestive marks "convey impressions of goods that require the consumer to use imagination or any type of multistage reasoning to understand the mark's significance." *Pom Wonderful*, 775 F.3d at 1126.  "Generic marks are not eligible for trademark protection." *Zobmondo Entm't, LLC*, 602 F.3d at 1113.

8.      Pursuant to the Joint Pre-Trial Conference Order, the Parties stipulate that the marks are distinctive, nonfunctional, and not generic.  (Docket No. 133 ¶ 6 (iii–v)).

9.      The Court **CONCLUDES** that the El Carmen Marks are arbitrary or fanciful and thus, strong.  The English translation of "Perla" "Bandera De El Salvador" is "Pearl" "Flag of El Salvador".  Although the logo contains a cow and Plaintiffs sell dairy products, the Court determines that the El Carmen Marks are not suggestive, as the logo is often used in connection with the sale of non-dairy products, such as refried beans and rice.

## 2.    Ownership
### a.  Priority of Use

10.     "It is axiomatic in trademark law that the standard test of ownership is priority of use.  To acquire ownership of a trademark it is not enough to have invented the mark first or even to have registered it first; the party claiming ownership must have been the first to actually use the mark in the sale of goods or services." *Sengoku Works, Ltd. v. RMC Int'l, Ltd.*, 96 F.3d 1217, 1219 (9th Cir. 1996); *see also Quiksilver, Inc. v. Kymsta*

*Corp.*, 466 F.3d 749, 756 (9th Cir. 2006) ("Trademark rights are acquired by the party that first uses a mark in connection with the sale of goods.").

11.    For goods, "a mark is in 'use in commerce' when (1) the mark has been placed on the goods or their containers, labels or the documents associated with the goods or their sale, and (2) the goods are 'sold or transported in commerce.'" *Karl Storz Endoscopy AM., Inc. v. Surgical Techs., Inc.*, 285 F.3d 848, 855 (9th Cir. 2002).  The Ninth Circuit follows a "totality of the circumstances" approach to examine whether the two prongs of "use in commerce" are satisfied, turning on "'evidence showing, first, adoption, and second, [u]se in a way sufficiently public to identify or distinguish the marked goods in an appropriate segment of the public mind.'" *Rearden, LLC v. Rearden Com., Inc.*, 683 F.3d 1190, 1205 (9th Cir. 2012) (quoting *New W. Corp. v. NYM Co. of Cal.*, 595 F.2d 1194, 1200 (9th Cir. 1979)).

12.    The Court **FINDS** that Plaintiffs created a rebuttable presumption by having registered the El Carmen Marks first.  For the reasons detailed in paragraphs 95 and 96 above, Defendants did not meet their burden to rebut this presumption.

13.    Accordingly, the Court concludes that Plaintiffs sufficiently demonstrated priority of use.

### 3.    Likelihood of Confusion

14.    In evaluating the likelihood of confusion, courts employ the eight-factor test articulated by the Ninth Circuit in *AMG Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348–49 (9th Cir. 1979).  These factors are: (1) the similarity of the marks; (2) the proximity of the goods covered by the marks; (3) the strength of the claimed mark; (4) similarity of marketing or advertising channels; (5) the degree of care likely to be exercised by the purchaser; (6) actual confusion over the marks; (7) the intent of defendants; and (8) likelihood of expansion of the product lines.  *Id.*

### a.  Similarity of the Marks

15.    As the Ninth Circuit explained in *Pom Wonderful*, "[t]his factor is always important in determining whether a likelihood of confusion exists because when 'marks

are entirely dissimilar, there is no likelihood of confusion.'" 775 F.3d at 1127 (quoting *Brookfield Commc'n v. West Coast Entm't*, 174 F.3d 1036, 1054 (9th Cir. 1999)). Accordingly, as the similarities between two marks increase, so too does the likelihood of confusion. *See GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1206 (9th Cir. 2000) (holding that marks were "strikingly similar" when considered with colors as used in commerce despite PTO's determination that they were not confusingly similar based on black and white submission).

16.    In evaluating similarity, the following axioms guide the Court: (1) similarity is best evaluated by appearance, sound, and meaning; (2) marks should be considered in their entirety and as they appear in the marketplace; and (3) similarities weigh more heavily than differences. *Pom Wonderful*, 775 F.3d at 1127-28 (citing *Entrepreneur Media, Inc. v. Smith*, 279 F.3d 1135, 1144 (9th Cir. 2002)). In considering the marks' similarities, the Court does not dissect the marks but considers the overall impression they give to consumers. *Playmakers, LLC v. ESPN, Inc.*, 297 F. Supp. 2d 1277, (W.D. Wash. 2003), *aff'd*, 376 F.3d 894 (9th Cir. 2004) ("[W]hat is critical is the overall appearance of the mark as used in the marketplace, not a deconstructionist view of the different components of the marks").

17.    The Court **FINDS** that Amerisal Foods's "Perla" and "Perla Bandera de El Salvador" Marks and Chaparrastique's "Las Perla" and "Las Perlas" marks are sufficiently similar such that this *Sleekcraft* factor weighs in favor of finding likelihood of confusion.

### b. Proximity of Goods Covered by the Marks

18.    This factor reflects the common-sense intuition that the danger of consumer confusion is heightened where goods are related or complimentary. *See E. & J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1291 (9th Cir. 1992) (citing *Sleekcraft*, 599 F.2d at 350). "Related goods . . . are those which would be reasonably thought by the buying public to come from the same source if sold under the same mark." *Rearden*, 683 F.3d at 1212 (internal quotation omitted). To satisfy this factor, parties do not need to be

direct competitors, so long as the goods are similar in use and function.  *See Entrepreneur Media*, 279 F.3d at 1147 (explaining that goods are related when both companies offer products relating to the same general industry).

19.    The Court **FINDS** that this *Sleekcraft* factor weighs in favor of finding likelihood of confusion.  The parties' Perla cheese and cream products compete in the same stores and types of businesses that target consumers seeking to buy specialty food products from El Salvador.  Both parties also sell these products for similar prices within a few dollars of each other.

### c.  Strength of the Claimed Mark

20.    For the reasons cited in Section II.A.2(a), Paragraph 11, the Marks at issue here are arbitrary or fanciful.

21.    However, "[i]dentifying whether a mark is arbitrary, fanciful, suggestive, descriptive, or generic is only the first step.  The second step is to determine the strength of the mark in the marketplace, *i.e.*, the commercial strength of the mark."  *Pinterest, Inc. v. Pintrips, Inc.*, 140 F. Supp. 3d 997, 1010 (N.D. Cal. 2015) (citation omitted).

22.    The Court **FINDS** that this *Sleekcraft* factor weighs in favor of finding likelihood of confusion.  The evidence at trial establishes that the El Carmen Marks have been in continuous use since at least April 2006.  Plaintiffs sell their products bearing the El Carmen Marks in several chain stores and on their online website amerisalfoods.com.

### d.  Similarity of Marketing or Advertising Channels

23.    "In assessing marketing channel convergence, courts consider whether the parties' customer bases overlap and how the parties advertise and market their products."  *Pom Wonderful*, 775 F.3d at 1130.  "Marketing channels can converge even when different submarkets are involved so long as the general class of purchasers exposed to the products overlap."  *Id.* (internal quotation omitted).

24.    The Court **FINDS** that this *Sleekcraft* factor weighs in favor of finding likelihood of confusion.  The evidence at trial establishes that the parties' customer bases of individuals seeking to buy products from El Salvador overlap to a significant degree.

Additionally, both parties intentionally market their products to these consumers by using Salvadoran imagery (including maps and flags) on their products.

### e. Degree of Care Likely to Be Exercised by the Purchaser

25.    The Court views the parties' products from the standpoint of "typical buyer exercising ordinary caution." *Sleekcraft*, 599 F.2d at 353 (citing *HMH Publishing Co. v. Lambert*, 482 F.2d 595, 599 n.6 (9th Cir. 1973)).  It is generally assumed that confusion is more likely among purchasers of inexpensive goods, who are likely to exercise a low degree of care.  *See Pom Wonderful*, 775 F.3d at 1127 ("Unlike purchasers of expensive goods—whom we expect to be more discerning and less easily confused—purchasers of inexpensive goods are likely to exercise less care, thus making confusion more likely.") (internal quotation marks omitted).

26.    The Court **FINDS** that this *Sleekcraft* factor weighs in favor of finding likelihood of confusion.  The evidence at trial establishes that consumers shopping at markets take cheese and cream products, all of less than $10 in value, quickly off shelves without taking much time to study the package.

### f. Actual Confusion Over the Marks

27.    "Evidence of actual consumer confusion 'is not necessary for a finding of likelihood of confusion, but it bears on the inquiry and is particularly potent." *Synoptek, LLC v. Synaptek Corp.*, 309 F. Supp. 3d 825, 839 (C.D. Cal. 2018) (citation omitted).

28.    The Court **FINDS** that this *Sleekcraft* factor weighs in favor of finding likelihood of confusion.  The evidence adduced at trial also established confusion in the marketplace between both parties' marks.  At trial, the defense counsel and witnesses also mixed up the names of each company's products—the Court heard many variations of "Las Perlas," "Las Perla," "La Perla," and "Perla" used without clear reference to either or even one specific product.

### g. Intent of Defendants

29.    When an alleged infringer knowingly adopts a mark similar to another's, courts will generally presume an intent to deceive the public. *Official Airline Guides, Inc.*

*v. Goss*, 6 F.3d 1385, 1394 (9th Cir. 1993); *see also Fleischmann Distilling Corp. v. Maier Brewing Co.*, 314 F.2d 149, 158 (9th Cir. 1962) (explaining that defendant's adoption of the "Black & White" mark used by a well-known whiskey company indicates that the brewing company expected confusion and resulting profit). Generally, however, the intent factor will be of minimal importance because intent can be hard to prove and "evidence of the defendant's intent to confuse customers . . . is not required for a finding of a likelihood of confusion." *Pom Wonderful*, 775 F.3d at 1131.

30. The evidence at trial does not establish that either party adopted a similar version of the Perla mark with an intent to deceive the public. Both parties have established their company's first use of the mark before 2010, and many of the witnesses who worked closely with the marks from that period were not able to testify. Accordingly, the Court **FINDS** that this *Sleekcraft* factor is neutral in finding a likelihood of confusion.

### h. Likelihood of Expansion of the Product Lines

31. The final *Sleekcraft* factor directs the court to consider the likelihood that one of the parties' product lines will expand to compete with the other. Again, evidence of product expansion is not required for a finding of likelihood of confusion. *Pom Wonderful*, 775 F.3d at 1131 (citing *Lahoti v. Vericheck, Inc.*, 636 F.3d 501, 509 (9th Cir. 2011) (characterizing the product expansion factor as "neutral" because neither party presented evidence regarding the likelihood of expansion)).

32. Here, the evidence at trial established that the parties' products already directly compete with one another. Accordingly, the Court **FINDS** that this *Sleekcraft* factor is neutral in finding a likelihood of confusion.

### i. Totality of *Sleekcraft* Factors

33. The foregoing analysis reveals that six factors weigh in favor of Plaintiffs: similarity of the marks, proximity of the goods, strength of the marks, similarity of marketing channels, degree of care exercised by consumers, and actual confusion. The remaining two factors are neutral: Defendants' Intent and likelihood of expansion. ///

34.    As explained in *Pom Wonderful*, "[s]heer numerosity of *Sleekcraft* factors . . . is not by itself dispositive of the ultimate likelihood-of-confusion determination." 775 F.3d at 1132 (citing *Goss*, 6 F.3d at 1395).  The Court must instead consider the factors taken together, and in context.  *See id.*; *Entrepreneur Media*, 279 F.3d at 1140 (while the *Sleekcraft* analysis guides the Court, "the totality of facts in a given case that is dispositive").

35.    Here, in considering the totality of the circumstances, the Court determines there is a likelihood of confusion.  Defendants' products not only bear marks that are visually and phonetically similar to Plaintiffs' marks but also that are similar to the goods sold by Plaintiffs to the same class of consumers.  Moreover, the evidence at trial established that actual confusion has already occurred.

**B.    Affirmative Defenses to El Carmen's Trademark Infringement Claims**

      **1.    Laches**

36.    Laches is an equitable time limit on a party's right to bring suit and bars a claim upon a showing of (1) unreasonable delay by plaintiff in bringing suit, and (2) prejudice.  *Miller v. Glenn Miller Prods., Inc.*, 454 F.3d 975, 997 (9th Cir. 2006).  "This defense embodies the principle that a plaintiff cannot sit on the knowledge that another company is using its trademark, and then later come forward and seek to enforce its rights."  *Internet Specialties W., Inc. v. Milon-DiGiorgio Enters., Inc.*, 559 F.3d 985, 989 (9th Cir. 2009).

37.    "We analyze the laches defense with a two-step process."  *La Quinta Worldwide LLC v. Q.R.T.M., S.A. de C.V.*, 762 F.3d 867, 878 (9th Cir. 2014).  "First, we assess the plaintiff's delay by looking to whether the most analogous state statute of limitations has expired. . . . If the most analogous state statute of limitations expired before suit was filed, there is a strong presumption in favor of laches."  *Pinkette Clothing, Inc. v. Cosmetic Warriors, Ltd.*, 894 F.3d 1015, 1025 (9th Cir. 2018) (citations omitted).  "Second, we assess the equity of applying laches using the *E-Systems* factors: (1) 'strength and value of trademark rights asserted;' (2) 'plaintiff's diligence in enforcing mark;' (3)

'harm to senior user if relief denied;' (4) 'good faith ignorance by junior user;' (5) 'competition between senior and junior users;' and (6) 'extent of harm suffered by junior user because of senior user's delay.'" *Id.* "[I]n each case, the district court must weigh the plaintiff's delay and the resulting prejudice to the defendant to determine whether and to what extent laches bars the requested relief, including a request for an injunction." *Id.* at 1027.

38.    ""[L]aches typically does not bar prospective injunctive relief. However, the rule is not . . . an absolute one.' . . . [I]n each case, the district court must weigh the plaintiff's delay and the resulting prejudice to the defendant to determine whether and to what extent laches bars the requested relief, including a request for an injunction." *Id.* (quoting *Danjaq LLC v. Sony Corp.*, 263 F.3d 942, 959 (9th Cir. 2001)).

39.    The most analogous state statute of limitations in this case is California's four-year statute of limitations for trademark infringement actions. Here, Plaintiffs' delay was over 10 years. Because more than four years have passed, there is a presumption of laches. *See Eat Right Foods Ltd. v. Whole Foods Mkt., Inc.*, 880 F.3d 1109, 1116 (9th Cir. 2018).

40.    Here, the Court determines that the balance of equities bars Plaintiff's claims. Specifically, the second, fourth, and sixth *E-Systems* factors weigh heavily in favor of finding laches.

41.    As to the second factor, Plaintiff should have known about its claims as early as April 2009—when Ms. Faggiolly received an invoice showing GSUS Empire bought a "Las Perlas" product from Chaparrastique—or November 2010—when Amerisal sent the first cease-and-desist letter to Defendants. (*See* Jx. 29) (invoice showing GSUS Empire bought a "Las Perlas" product from Chaparrastique on April 3, 2009); (Px. 58) (cease and desist letter sent by Amerisal to Defendants on November 17, 2010). Plaintiffs' excuse for the delay—namely that they had insufficient funds to pursue litigation—are unpersuasive. At the trial, Ms. Faggiolly testified that, sometime between 2012 and 2013, she filed 15 oppositions before the Trademark Trial and Appeal Board and initiated a

1    separate lawsuit in District Court.  (*See* Docket No. 149 at 175:14–177:11); *Pinkette*

2    *Clothing, Inc.*, 894 F.3d at 1027 (affirming decision that after jury found infringement, a

3    five-year delay triggered laches that barred a permanent injunction).

4        42.    As to the fourth factor, the evidence adduced at trial establishes the good

5    faith ignorance of Defendants.  Specifically, Defendants faithfully believed they had

6    common law rights in Chaparrastique's "Las Perla" and "Las Perlas" marks and made

7    several expenditures in support of that belief.

8        43.    As to the sixth factor, the evidence adduced at trial establishes that

9    Defendants have built a business around Chaparrastique's "Las Perla" and "Las Perlas"

10   marks such that Plaintiff's delay in bringing suit has caused harm to Defendants.  *See*

11   *Grupo Gigante SA De CV v. Dallo & Co.*, 391 F.3d 1088, 1105 (9th Cir. 2004) ("[A]

12   defendant can make the required showing of prejudice by proving that it has continued to

13   build a valuable business around its trademark during the time that the plaintiff delayed

14   the exercise of its legal rights.").  Moreover, the evidence presented at trial established

15   that Defendants suffered undue prejudice as a result of Plaintiffs' delay in bringing this

16   action in the form of lost evidence—namely, the loss of testimony from Eliseo Rubio due

17   to his illness.

18       44.    The Court also concludes that Defendants' infringement of the El Carmen

19   Marks was not willful, which would bar the application of laches.

20       45.    Accordingly, the Court **FINDS** laches applies here.

21   **C.    Public Safety Exception to Laches**

22       46.    "If it is inevitable that a significant amount of confusion will probably be

23   created by the junior user's actions, then the right of the public not to be confused and

24   deceived may outweigh the inequity to the junior user of the trademark owner's delay in

25   suing [and defeat a defense of laches]."  *Pinkette*, 894 F.3d at 1029 (internal citation and

26   quotation marks omitted).  But "the danger of 'inevitable confusion' between products

27   will defeat a successful laches defense only in a narrow set of circumstances."  *Id.*  "[I]n

28   order to ensure that laches remains a viable defense to Lanham Act claims, the public's

interest will trump laches only when the suit concerns allegations that the product is harmful or otherwise a threat to public safety and well being." *Tillamook Country Smoker, Inc. v. Tillamook Cnty. Creamery Ass'n*, 465 F.3d 1102, 1111 (9th Cir. 2006) (citation omitted).

47.    Here, Plaintiffs contend that the exception applies because Defendants improperly labeled their products and continued operating after the Los Angeles County Department of Health ordered them to shut down all operations.

48.    The Court **FINDS** that the evidence does not establish that Defendants' products are harmful or a threat to public safety and well-being.  While it is likely that Chaparrastique continued operations after being ordered to shut down, the evidence at trial also established that Mr. Rubio had to quickly take charge of a family business in the middle of a pandemic and while his father—who, up to that point, had managed the business—became seriously ill and was hospitalized.  The mistaken actions taken by Mr. Rubio at that time, along with the alleged mislabeling of any products, do not amount to a threat to public safety and well-being such that the balance of the equities weigh against the application of laches.

49.    Accordingly, the Court concludes the public safety exception to laches does not apply, and Plaintiffs' trademark infringement claims are thus barred.

### D.    Counterclaims filed by Chaparrastique

#### 1.    False Designation of Origin

50.    Because the trademark infringement analysis in Section II.A. is resolved in favor of Plaintiffs, Defendants First Counterclaim for False Designation of Origin lacks merit.

#### 2.    Declaratory Relief

51.    Because the trademark infringement analysis in Section II.A. is resolved in favor of Plaintiffs, Defendants Second Counterclaim for Declaratory Relief for Cancellation of El Carmen's Trademark Registrations lacks merit.

///

## <u>VERDICT</u>

The Court **FINDS** and **CONCLUDES** as follows:

1. On Plaintiffs' First Claim for Trademark Infringement, in violation of 15 U.S.C. § 1114, the Court finds in favor of Plaintiffs.

2. On Plaintiffs' Second Claim for False Designation of Origin, in violation of 15 U.S.C. § 1125, the Court finds in favor of Plaintiffs.

3. On Defendants' First Counterclaim for False Designation of Origin, in violation of 15 U.S.C. § 1125, the Court finds in favor of Plaintiffs.

4. On Defendants' Second Counterclaim for Declaratory Relief for Cancellation of Plaintiffs' Trademark Registrations, the Court finds in favor of Plaintiffs.

5. On Defendants' Affirmative Defenses, the Court finds in favor of Defendants as to the affirmative defense of laches.  This finding both acts as a bar to entry of judgment on Plaintiffs' claims for relief and as a bar to the requested remedies.

6. No party should be viewed as having prevailed.

The Court will enter a separate judgment pursuant to Federal Rules of Civil Procedure 54 and 58(b).

Dated:  April 2, 2025.

_____

MICHAEL W. FITZGERALD
United States District Judge